**2023 IL 128747**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 128747)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
MITCHELL DEANDRE BUSH, Appellant.

*Opinion filed November 30, 2023.*


JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Overstreet, Holder White, Cunningham, and Rochford concurred in the judgment and opinion.

Justice O'Brien took no part in the decision.


## OPINION

¶ 1       Defendant, Mitchell Deandre Bush, was found guilty of felony murder, second degree murder, aggravated battery with a firearm, two counts of mob action, reckless discharge of a firearm, and unlawful possession of a weapon by a felon after a jury trial. The appellate court reversed defendant's conviction of aggravated

battery with a firearm, vacated the jury's finding of guilty of reckless discharge of a firearm, and affirmed defendant's convictions and sentences of felony murder and unlawful possession of a weapon by a felon. 2022 IL App (3d) 190283, ¶ 1. This court granted defendant's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021). For the following reasons, we affirm the appellate court's judgment.

## I. BACKGROUND

On May 17, 2016, defendant and his cousin Henry Mayfield (Mayfield) were involved in a neighborhood dispute. Two families were involved, the Roberson group and the Price group. Laterra Price's son had sold an expensive belt to Minnie Roberson's son. The belt belonged to Price, and Price wanted the belt returned. Members of Price's group went to Roberson's residence multiple times on the day of the shooting. The dispute intensified over the course of the day and culminated in defendant firing the shots that killed Dwayne Jones and injured Lathaniel Gulley (Gulley).

### A. Circuit Court Proceedings

Defendant was charged by indictment, with codefendant Mayfield, of two counts of first degree murder (720 ILCS 5/9-1(a)(2) (West 2016)), one count of felony murder (*id.* § 9-1(a)(3)), one count of aggravated battery (*id.* § 12-3.05(e)(1)), and two counts of mob action (*id.* § 25-1(a)(1)). Defendant was also charged individually with one count of unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)).

#### 1. Pretrial Motion *in Limine*

Prior to trial, defendant filed a motion *in limine* to admit a "rap video reciting the events at issue in this case." The defense sought to admit the video if either Gulley or his brother Gabe Gulley (Gabe) testified inconsistently with the statements made in the video. The defense proffered the video as an offer of proof. At the beginning of the video, Gabe states that "this is a true story" and "true facts." Gabe continues that the video relates to the homicide of Jones (referred to in the

video by his nickname "Wheezy") that occurred on May 17. At the end of the video, Gulley appears and says, "this was a real life story."

¶ 8 In the video, Gabe states that he received a call from his brother. Gulley told Gabe there was a "situation" where Gulley beat up some younger individuals after they were talking about "pulling triggers." Gabe told Gulley to pick him up because he was "ready" or "trained" to go. Gulley arrived and picked up Gabe and Wheezy. The group returned to Roberson's home. Gabe states that there were "four of us posted in that driveway" when four cars pulled up. Gabe appears to state that the four individuals in the driveway thought they were going to "knuckle" the others. Mayfield then swung a pole at Wheezy, which prompted defendant to empty a clip, striking Wheezy and Gulley. Gabe concludes the video by describing the injuries to Wheezy, his death, and the effect the events had on Gabe.

¶ 9 At the hearing on the motion, trial counsel stated that the video represented Gabe's version of the events, namely, that Gulley called Gabe because he was needed in a fight. Trial counsel sought to use the video if Gabe's story changed during trial. The State responded that the video was not a prior statement and, instead, was a "work of art," not a "statement given to authorities." The trial court denied defendant's motion, stating that to admit a prior statement there must be "some indication of a necessity to be honest, to be true, to be accurate." The trial court concluded that there was not that guarantee in making a rap video.

¶ 10                                    2. Jury Trial

¶ 11 The evidence at trial was largely uncontested. The shooting and the moments before the shooting were captured on a cell phone video. We summarize the relevant portions of the trial evidence and note conflicts in the evidence where necessary.

¶ 12 On May 17, 2016, a dispute arose between the families Roberson and Price, concerning a belt that Price's son had sold to Roberson's son. The belt was Price's, and she wanted it returned. The dispute played out over the course of the day on May 17 at Roberson's home on Virden Street in Peoria. Various members of Price's group returned to Roberson's home several times. During one visit, a physical confrontation occurred with Gulley, who was Roberson's boyfriend, striking

Tresean Dillard and other members of Roberson's group striking Jayurion Mayfield (Jayurion). Jayurion and Dillard are the teenage cousins of Price. Jayurion is the son of Henry Mayfield and Kimberly Williams. Dillard is the son of Sharonda Brown. The perspective from members of Price's side was that Jayurion and Dillard had been "jumped." Police arrived and convinced Price, Dillard, Jayurion, and Brown, who had arrived after the altercation, to leave the scene.

¶ 13        During the first physical altercation, Mayfield was at a dialysis appointment. Williams picked up Mayfield and then picked up defendant, as it was customary for Mayfield and defendant to socialize after the dialysis appointments. While in the car, Williams received a call over speaker phone from Price informing Williams that Jayurion had been jumped by multiple adults and other people. Williams discussed that information with Mayfield. Williams then picked up Jayurion from Price's house, which was only a few blocks from Roberson's residence. On the car ride to Roberson's, Jayurion explained that multiple adults and children had jumped him and Dillard. Defendant testified that he did not hear any of the conversations about the physical confrontation.

¶ 14        Williams pulled in front of Roberson's residence, and Williams, Mayfield, Jayurion, and defendant all walked toward Roberson's driveway. Within seconds, two more vehicles carrying Jerricca Williams (Williams's daughter), Sharonda Brown, Dillard, and Price arrived, among others. There were approximately 12 people, who were part of Price's group, standing on the sidewalk or street immediately in front of Roberson's property.

¶ 15        After the first altercation, Roberson left with Gulley to pick up Gulley's son from school. While away, the two received reports about a commotion outside Roberson's residence. The two dropped off Gulley's son at Gulley's mother's home and picked up Gabe and Jones for support and protection. When Roberson, Gulley, Gabe, and Jones returned, the cars containing Price's group started to arrive at Roberson's residence. A group of approximately eight or nine people joined Roberson's group in Roberson's front yard and driveway.

¶ 16        Tensions quickly escalated as the groups yelled back and forth. Each group's version of events painted the other side as the aggressors. For example, Roberson and Gulley testified that no one on their side had any weapons. On the other hand, Jayurion testified that members of Roberson's group had knives, bats, and cans in

socks. Williams also testified that Roberson's group had knives, sticks, and objects in socks. Williams explained that Roberson's group was in an "up-guarded position," "ready to fight." Gulley admitted that he was ready and willing to fight.

¶ 17    Defendant testified that he displayed his gun, but only after threats were directed at him and Price's group. According to defendant, Gulley responded "we got guns, too." Gulley testified that he did not recall what he said but that he did not converse with defendant and no one on Roberson's side had a weapon. Defendant testified that he then "cocked the gun back" and told Gulley that the gun was not a toy and that he was not playing. At this point, Mayfield entered Roberson's driveway and swung a broomstick at Jones and Gulley. Jones attempted to grab the broomstick, but Mayfield retained possession and retreated from the driveway. Gulley testified that Mayfield yelled "shoot" immediately prior to defendant firing the shots. Defendant testified that he did not see Mayfield as the aggressor and thought the broomstick came from the other side. Defendant was terrified due to Mayfield's physical condition. Defendant testified that he fired the shots because he was "scared."

¶ 18    Defendant's interview with police, the day after the shooting, was admitted into evidence. Defendant initially denied being the shooter. After being told that police knew he was the shooter, defendant admitted to being the shooter but claimed that he picked the gun up after it fell out of the shirt of someone on the other side. When told that his account was inconsistent with video evidence, defendant admitted to bringing the gun because he felt something would happen to him if he did not have the gun. Defendant stated at the end of the interview and in his testimony that he brought the gun so that Mayfield could help him sell it. Defendant generally maintained that he fired the shots because he was scared for both his safety and the safety of Mayfield and Jayurion. Defendant also maintained, both in his interview and his testimony, that he was not trying to shoot anybody and, instead, was trying to shoot at the ground and then over the others' heads.

¶ 19    As mentioned above, the shooting was captured on a cell phone video. Seconds prior to the shooting, Jerricca Williams is seen swinging a broomstick over the fence into Roberson's yard. Mayfield enters Roberson's driveway, at least a few feet, and swings a broomstick at Jones and Gulley. Defendant simultaneously walks toward the driveway behind Mayfield. Jones attempts to grab the broomstick, but

Mayfield retains possession and retreats from the driveway. As Mayfield leaves Roberson's property, defendant, now at the edge of the driveway, begins firing a handgun. When defendant fired the first shot, every member of Price's group is either parallel to or behind defendant. The individuals in Roberson's driveway are at least five feet inside Roberson's property.

¶ 20 Defendant fired a total of at least seven shots, some of which struck Roberson's residence. Jones was struck in the torso and Gulley in the arm. Jones died from the gunshot wound, and Gulley spent several days in the hospital recovering from his injuries.

¶ 21 On the third day of trial, the bailiff informed the trial court that a juror "recognized" someone who was sitting in the gallery. Juror Proctor was summoned to the court's chambers and was questioned by the judge, the State, and trial counsel. Juror Proctor told the court that she recognized a woman who was present for the first time on the second day of trial. Juror Proctor continued to listen to the case when "a young man," whom juror Proctor knew to be the woman's son, walked up to the witness stand. Juror Proctor explained that her "daughter [was] married to this lady." The woman was Lathaniel and Gabe Gulley's mother. Trial counsel asked why juror Proctor did not speak up when Gulley's name was called during *voir dire*. Juror Proctor responded that she did not recognize the name because she did not "talk to them like that." Juror Proctor further stated that she did not know Gulley was involved in "anything" and she had never met him. Juror Proctor assured the court that she could be fair and impartial. After the additional questioning, the trial court asked if the defense wanted to be heard, and trial counsel responded, "No." The court then decided that juror Proctor would remain on the jury. The trial court commented "we all agree that the juror should remain on the jury" and that it was not a "close call." In a supplemental motion for a new trial, trial counsel argued that it was error for the trial court not to remove juror Proctor and that trial counsel did not comprehend the nature of the relationship during trial.

¶ 22 The jury found defendant guilty of felony murder, second degree murder, aggravated battery with a firearm, reckless discharge of a firearm, two counts of mob action, and unlawful possession of a weapon by a felon. The trial court sentenced defendant to consecutive prison terms of 65 years (40 years plus a 25-year firearm enhancement) for felony murder and 15 years for aggravated battery

with a firearm and to a concurrent prison term of 7 years for unlawful possession of a weapon by a felon.

¶ 23                                    B. Appellate Court Proceedings

¶ 24        On appeal, defendant argued that (1) he was not proven guilty beyond a reasonable doubt of felony murder, (2) under the facts of the instant case, mob action could not properly serve as the underlying felony for the felony murder conviction, (3) the jury verdicts were legally inconsistent, (4) he was deprived of a fair trial due to cumulative error, and (5) his sentences for felony murder and aggravated battery with a firearm were excessive. 2022 IL App (3d) 190283, ¶ 1. The appellate court agreed with a part of defendant's third argument. *Id.* ¶¶ 1, 105. Thus, the court reversed defendant's conviction of aggravated battery with a firearm and vacated the jury's guilty verdict on the reckless discharge of a firearm count. *Id.* ¶ 1. The court otherwise rejected each of defendant's arguments and affirmed the remaining convictions and sentences. *Id.* ¶¶ 1, 121.

¶ 25        Specific to the issues presented here, the appellate court concluded that there was sufficient evidence to establish defendant's guilt of mob action beyond a reasonable doubt. *Id.* ¶ 92. The appellate court noted the evidence that Mayfield directed defendant to shoot. *Id.* The jury was also presented with evidence that the initial altercation where Jayurion was "jumped" was discussed in defendant's presence on two occasions. *Id.* Then defendant arrived at Roberson's residence at "precisely the same time that several other people connected to Price also went to Roberson's home." *Id.* The appellate court held that

> "[t]he jury could have reasonably inferred from that evidence that defendant was aware of the prior altercation; that defendant was aware of Price's group's purpose for going to Roberson's residence; and that defendant, Mayfield, and the other members of Price's group had jointly gone to Roberson's home to fight Roberson's group or to take revenge for the altercation that had happened earlier that day." *Id.*

¶ 26        The appellate court also rejected defendant's argument that mob action could not serve as the predicate felony for his felony murder conviction. *Id.* ¶ 98. In the factual context of this case, "the acts that gave rise to the mob action charge were

independent from, and involved a different felonious purpose than, the acts that resulted in Jones's death." *Id.* The court found that the

> "mob action offense was completed in this case when defendant, Mayfield, and the other members of Price's group went to Roberson's residence to fight Roberson's group and then started carrying out that common purpose using force or violence, such as when Mayfield swung at Jones and Gulley with the broomstick." *Id.*

Thus, the mob action was "not inherent in the shooting that occurred immediately thereafter and involved a different felonious purpose." *Id.*

¶ 27     The appellate court summarily rejected defendant's claim that the trial court abused its discretion in not admitting the video, stating that "the rap video was made solely for entertainment purposes and was not akin to a prior statement by the witness." *Id.* ¶ 112. The court was similarly unpersuaded by defendant's claim of juror bias. *Id.* ¶ 113. The court recognized that, "[a]lthough the juror in this case was related by marriage to Gulley (one of the victims/witnesses), she did not know Gulley and had never spoken to him." *Id.* Defendant's implied bias claim failed because the juror was not related to any party to the appeal. *Id.* And defendant's "mere speculation" that the juror was biased was insufficient "in light of the juror's unequivocal statement upon inquiry by the trial court that her relationship to Gulley and Gabe's mother would not affect her ability to be fair and impartial." *Id.*

¶ 28     We granted defendant's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

¶ 29                                II. ANALYSIS

¶ 30     Defendant raises four arguments on appeal. First, defendant contends that the State did not prove that he engaged in the predicate felony of mob action. Second, defendant argues that mob action could not serve as the predicate felony for felony murder because there was no "independent felonious purpose." Third, defendant argues that the trial court erred in denying his motion *in limine* to admit Gabe's rap video. Finally, defendant argues that the trial court erred in allowing a juror to

- 8 -

remain on the jury after the juror revealed an implied bias.

¶ 31                    A. The State Proved That Defendant Engaged
                          in the Predicate Felony of Mob Action

¶ 32       Defendant first argues that the State failed to prove that he engaged in the predicate felony of mob action. Specifically, defendant argues that the State failed to prove that he "participated with [Mayfield] in the altercation prior to the shooting." The State responds that the evidence "permits the reasonable conclusion that [Mayfield] was attempting to forcibly attack the victims and defendant fired his gun to assist [Mayfield]."

¶ 33       Defendant's argument requires us to review the sufficiency of the evidence. When reviewing a claim of the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985). We will set aside a conviction only where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Swenson*, 2020 IL 124688, ¶ 35. "All reasonable inferences are drawn in favor of a finding of guilt." *Id.* "Further, in weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it ***." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 34       Defendant's felony murder charge was predicated on mob action, which required the State to prove that defendant attempted to or did engage in the "knowing or reckless use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law." 720 ILCS 5/25-1(a)(1) (West 2016); *id.* § 9-1(a)(3) (providing that a person is guilty of first degree murder where he or she "is attempting or committing a forcible felony other than second degree murder" and an individual dies in the course of or in furtherance of the forcible felony). Defendant's challenge is directed at the "acting together" requirement. To satisfy this element, the State must show that a defendant "was part of a group engaged in physical aggression reasonably capable of inspiring fear of injury or harm." *In re B.C.*, 176 Ill. 2d 536, 549 (1997). "Acting together" requires

a "concerted action—that is, a common purpose or agreed-upon course of action." *People v. Barnes*, 2017 IL App (1st) 142886, ¶ 68 (providing a historical analysis of the legislature's codification of mob action as the unification of the prior offenses of riot, rout, and affray).

¶ 35        The State proved that defendant was "acting together" with Mayfield beyond a reasonable doubt. The trial evidence established that defendant arrived with Mayfield at Roberson's home. Both men exited the vehicle and immediately approached the driveway area. Meanwhile, two other cars full of people arrived on Price's side. Defendant was present in the vehicle when the purpose for going to Roberson's home—the prior attack on Mayfield's son Jayurion—was discussed multiple times. Defendant was armed with a loaded firearm and immediately began displaying the firearm and making threats toward Roberson's group. The video shows defendant walking toward the victims at the same time Mayfield approaches to swing the broomstick. There was also evidence that Mayfield directed defendant to shoot immediately before defendant fired several shots at Roberson's group. Thus, a rational juror could conclude, based on the aforementioned evidence, that defendant was actively engaged in the use of force or violence in concert with Mayfield.

¶ 36        Defendant's argument to the contrary is premised on the acceptance of his testimony. He argues that his mere presence at the scene was insufficient to establish that he was acting in concert with Mayfield. In defendant's view, his only potentially culpable conduct was the shooting in defense of Mayfield. However, the trier of fact was not required to accept defendant's innocent explanations for his conduct. See *People v. Simpkins*, 48 Ill. 2d 106, 109 (1971) (explaining that a trier of fact is not required to adopt a defendant's "pollyannaish view" of his conduct). The trier of fact was not required to accept defendant's testimony that he only brought the loaded firearm to sell it. The trier of fact was not required to accept defendant's testimony that he was unaware of the group's purpose in going to Roberson's home. As defendant's counsel admitted in closing, it was a "crazy coincidence" that defendant, self-professed to be inexperienced and unfamiliar with firearms, happened to have a loaded gun in his possession on the same day he was unwittingly taken to a neighborhood confrontation. In short, the jury was entitled to reject much of defendant's testimony. See *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 62 ("The trier of fact may accept or reject all or part of a witness'

testimony."). The jury could rationally infer that defendant was actively engaged in carrying out a common plan to use force or violence to avenge the earlier beating of Jayurion.

¶ 37                          B. Mob Action Properly Served
                            as the Predicate Felony for Defendant's
                                Felony Murder Conviction

¶ 38        Defendant's second attack on his felony murder conviction is that mob action could not serve as the predicate felony for his felony murder conviction. Defendant argues that the acts that proved the elements of mob action were inherent in Jones's murder. Thus, defendant argues, the acts constituting mob action were not done with an "independent felonious purpose." The State responds that this court should reject the same-act test because it is incompatible with the felony murder statute. The State also argues that, under any standard, mob action here properly served as the predicate felony because the offense of mob action was complete before the shooting that resulted in Jones's death.

¶ 39        We review *de novo* whether a particular forcible felony properly serves as a predicate felony for a felony murder conviction. *People v. Davison*, 236 Ill. 2d 232, 239 (2010).

¶ 40        The felony murder statute provides that a person commits felony murder if, "acting alone or with one or more participants, he is attempting or committing a forcible felony other than second degree murder, and in the course of or in furtherance of such crime or flight therefrom, he or she or another participant causes the death of a person." 720 ILCS 5/9-1(a)(3) (West 2016). "Forcible felony" includes several enumerated felonies[1] and "any other felony which involves the use or threat of physical force or violence against any individual." *Id.* § 2-8. As discussed above, mob action as charged here is defined as the "knowing or reckless use of force or violence disturbing the public peace by 2 or more persons acting

---

[1]The enumerated felonies are "treason, first degree murder, second degree murder, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, residential burglary, aggravated arson, arson, aggravated kidnaping, kidnaping, aggravated battery resulting in great bodily harm or permanent disability or disfigurement." 720 ILCS 5/2-8 (West 2016).

together and without authority of law." *Id.* § 25-1(a)(1). We have upheld felony murder convictions predicated on mob action (see *People v. Davis*, 213 Ill. 2d 459, 475 (2004); *Davison*, 236 Ill. 2d at 244), and defendant does not argue that mob action as charged does not qualify as a forcible felony.

¶ 41 We have already determined that a rational trier of fact could have found that defendant committed mob action. It is also beyond dispute that, during the commission of mob action, defendant shot and killed Jones. Notwithstanding what appears to be a clear-cut case of felony murder, defendant invokes our decision in *People v. Morgan*, 197 Ill. 2d 404 (2001), to argue that mob action could not properly serve as the predicate felony for his felony murder conviction.

¶ 42 In *Morgan*, this court adopted the "independent felonious purpose" test. *Id.* at 458. We held that, "where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder." *Id.* at 447. The defendant shot and killed his grandfather and grandmother, admitting the intent to kill but claiming that he was either justified or that the degree of murder should be mitigated to second degree. *Id.* at 449, 456-57. Because the defendant admitted the intent to kill, there was no intent to commit a forcible felony other than murder. And because the singular act of shooting each grandparent caused their death, the predicate felonies of aggravated battery and aggravated discharge of a firearm were inherent in the murders. *Id.* at 447.

¶ 43 We applied the rule from *Morgan* in *People v. Pelt*, 207 Ill. 2d 434 (2003). In *Pelt*, the evidence showed that the defendant threw his infant son into a dresser, which caused the infant's death. *Id.* at 442. The defendant was convicted of felony murder predicated on aggravated battery. *Id.* at 436. On appeal, the defendant challenged whether aggravated battery could serve as the predicate felony for his felony murder conviction. *Id.* at 440. We mentioned the "felonious purpose" test, but our focus was exclusively on the defendant's conduct. *Id.* at 442 ("Our task here is to discern from defendant's conduct whether defendant's aggravated battery was an act that was inherent in, and arose out of, the killing of the infant."). We held that the defendant's singular act of throwing the infant formed the basis for both the aggravated battery and the killing. *Id.* Thus, aggravated battery, based on the

defendant's act of throwing the infant, could not serve as the predicate felony for the defendant's felony murder conviction. *Id.*

¶ 44     The rule from *Morgan* as historically applied is consistent with the merger doctrine.[2] It is important to clarify how the merger doctrine works. As discussed above, in *Morgan*, we explained the doctrine as follows: "where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder." *Morgan*, 197 Ill. 2d at 447. We have only applied this rule twice, in *Morgan* and *Pelt*, to hold that a particular forcible felony could not serve as the predicate for a felony murder charge. *Id.*; *Pelt*, 207 Ill. 2d at 442. In both cases, the predicate felonies were singular acts of assaultive conduct that directly caused the victims' deaths. Thus, a clear limitation exists. The merger rule only applies where the predicate felony's sole purpose is to effectuate an act of physical violence contemplating death. See Russell R. Barton, *Application of the Merger Doctrine to the Felony Murder Rule in Texas: The Merger Muddle*, 42 Baylor L. Rev. 535, 552 (1990). The merger rule does not apply if the predicate felony has a felonious purpose that does not contemplate a physical act of violence resulting in death. *Id.*

¶ 45     For most predicate felonies, a categorical rule will apply. Where the gravamen of the predicate felony is not an act of physical violence contemplating death, the merger rule will not apply. All the enumerated felonies in our statute, aside from aggravated battery resulting in great bodily harm or disfigurement, are outside the scope of the merger rule. See, *e.g.*, *People v. Soznowski*, 22 Ill. 2d 540, 543 (1961) ("The gravamen of the offense of burglary is the intent with which the building is entered."); *People v. Hay*, 362 Ill. App. 3d 459, 465 (2005) ("The gravamen of the offense of robbery is the use of force or threat of the imminent use of force ***."); 51 C.J.S. *Kidnapping* § 18 (Aug. 2023 Update) (explaining that the "gravamen of the offense of kidnapping is some form of compulsion"; "actual physical force is not a necessary element"). In short, the essential characteristic of these felonies is not an act of physical violence where death is contemplated. Aggravated battery resulting in great bodily harm or disfigurement can be resolved on a case-by-case basis. Where the conduct charged contemplates death, then aggravated battery

_____

[2]Our holding in *Morgan* has at times been described as a "same-act" rule. See *Davison*, 236 Ill. 2d at 243-44 (declining the State's request that we disavow the "the same-act or merger doctrine").

resulting in great bodily harm is an improper predicate felony. See *Pelt*, 207 Ill. 2d at 442. On the other hand, where the conduct charged does not contemplate death, then aggravated battery resulting in great bodily harm is a proper predicate felony. See *People v. Viser*, 62 Ill. 2d 568, 579 (1975) [3] (upholding felony murder convictions premised on aggravated battery where the victim died weeks after numerous codefendants struck and punched the victim).

¶ 46    This interpretation of our merger doctrine is the most consistent with our historical application of the rule from *Morgan*. This interpretation of our merger doctrine also respects the legislature's intent to have three types of first degree murder and an offense of second degree murder. See Guyora Binder, *Making the Best of Felony Murder*, 91 B.U. L. Rev. 403, 521 (2011) ("The oft-stated purpose of a merger rule is to maintain the coherence and integrity of a scheme for grading homicide offenses."). Restricting the rule to our historical application should be sufficient to answer many of the critiques that have been lodged against our adoption of the merger rule. See *Davis*, 213 Ill. 2d at 488-89 (Garman, J., specially concurring); *Davison*, 236 Ill. 2d at 248 (Garman, J., specially concurring, joined by Burke, J.).

¶ 47    At the heart of our adoption of the merger doctrine was the concern that the State could effectively eliminate both the second degree murder statute and the need to prove an intentional or knowing killing in most murder cases. *Morgan*, 197 Ill. 2d at 447; *Baker v. Georgia*, 225 S.E.2d 269, 271 (Ga. 1976) (recognizing that the lack of a merger rule would allow the State to "bootstrap practically all killings with dangerous weapons into murder simply by showing that the assault out of

---

[3]We recognize that this court in *Viser* rejected the merger doctrine. *Viser*, 62 Ill. 2d at 579-80. The ruling was premised at least in part on the fact that the criminal code at the time did not establish degrees of murder. *Id.* at 580; see also *People v. Payton*, 356 Ill. App. 3d 674, 685 (2005) ("In addition, the supreme court's holding in *Viser* was based on the fact that the Code at the time did not establish degrees of murder. Since the decision in *Viser*, the Code has been amended to provide such classification of degrees of murder."). The decision also appears to view the merger doctrine as not only accompanying singular violent assaults but also those assaults accompanying otherwise valid predicate felonies. See *Viser*, 62 Ill. 2d at 580 ("And we are not concerned with whether the General Assembly, in establishing the offense of felony murder, intended to deter the criminal from the commission of rape, or robbery, or burglary, but not to deter him from the violent assault that accompanies each of those offenses."). These concerns were misplaced because the merger rule does not apply to assaults committed in furtherance of or during the commission of an otherwise proper predicate felony.

which the death arose was a felony"). Every fatal shooting "necessarily encompasses conduct constituting aggravated battery, *i.e.*, great bodily harm, as well as conduct constituting aggravated discharge of a firearm, *i.e.*, discharging a firearm in the direction of another." *Morgan*, 197 Ill. 2d at 447 "Potentially, then, all fatal shootings could be charged as felony murder based upon aggravated battery and/or aggravated discharge of a firearm." *Id.*

¶ 48        We maintain the concerns expressed in our previous felony murder decisions because our felony murder statute, unlike many other jurisdictions, does not specifically enumerate primarily nonassaultive felonies. See, *e.g.*, N.Y. Penal Law § 125.25(3) (McKinney 2020) (listing as predicate felonies "robbery, burglary, kidnapping, arson, rape in the first degree, criminal sexual act in the first degree, sexual abuse in the first degree, aggravated sexual abuse, escape in the first degree, or escape in the second degree"); Alaska Stat. § 11.41.110(a)(3) (West 2022) (listing as predicate felonies "arson in the first degree, kidnapping, sexual assault in the first degree, sexual assault in the second degree, sexual abuse of a minor in the first degree, sexual abuse of a minor in the second degree, burglary in the first degree, escape in the first or second degree, robbery in any degree, or misconduct involving a controlled substance under [various statutory provisions]"). Courts have properly rejected the merger doctrine where their state's felony murder statute limits "the felony-murder rule to homicides committed in the perpetration of specified felonies, *not including assault in any of its forms*." (Emphasis added.) *Robles v. Florida*, 188 So. 2d 789, 792 (Fla. 1966).

¶ 49        On the other hand, our felony murder statute provides that a predicate felony may be "aggravated battery resulting in great bodily harm" or any felony that "involves the use or threat of physical force or violence against any individual." 720 ILCS 5/2-8 (West 2020). When a felony murder statute encompasses unenumerated felonies, "including assault," the merger doctrine is necessary to preserve the legislature's intent to distinguish and grade homicide offenses. See *Commonwealth v. Gunter*, 692 N.E.2d 515, 525 (Mass. 1998) (explaining that, if "felonious assault [were] sufficient to support a conviction of murder in the first degree, the distinctions among homicides would be rendered meaningless: all murders in the second degree and manslaughters could be enhanced to murder in the first degree based on the felony-murder theory with assault as the underlying felony"); Binder, *supra*, at 548 (jurisdictions that "predicate felony murder only on

unenumerated felonies" are the ones most in need of an explicit merger doctrine); *People v. Miller*, 297 N.E.2d 85, 87 (N.Y. 1973) (explaining that the "merger doctrine" was necessary to "remedy a fundamental defect in the old felony-murder statute" where "[a]ny felony, including assault, could be the predicate for a felony murder"). As the New York high court in *Miller* recognized, because "every homicide, not excusable or justifiable, occurs during the commission of assault, every homicide would constitute a felony murder." *Miller*, 297 N.E.2d at 87.

¶ 50        For these reasons, we decline the State's request to abandon the merger doctrine. We are also persuaded to stay the course based on the doctrine of *stare decisis*. "The doctrine of *stare decisis* is the means by which courts ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 510 (1994). *Stare decisis* is not an "inexorable command," but " 'any departure from the doctrine of *stare decisis* demands special justification.' " *Id.* (quoting *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984)). We do not find that a special justification exists to abandon the merger doctrine.

¶ 51        That brings us to this case. Neither we nor our appellate court has ever utilized our merger rule to preclude a felony murder charge predicated on mob action. See *Davis*, 213 Ill. 2d at 474 (majority opinion) ("mob action was a proper predicate felony for felony murder"); *Davison*, 236 Ill. 2d at 243 ("the charged predicate felony of mob action properly formed the basis of defendant's felony-murder conviction"); *People v. Colbert*, 2013 IL App (1st) 112935, ¶ 16 ("the mob action properly served as a predicate felony for felony murder"); *People v. Tamayo*, 2012 IL App (3d) 100361, ¶ 27 ("the mob action served as a proper predicate for the felony murder conviction"). While each case was decided on its own facts, under our historical application of the merger rule, mob action would always be a proper predicate when proven because mob action is not an offense whose gravamen is an act of physical violence that contemplates death.[4] See *Dawson v. State*, 264 P.3d 851, 854 (Alaska Ct. App. 2011) (explaining that the gravamen of the offenses of

---

[4]We recognize that this court in both *Davis* and *Davison* commented that mob action was a proper predicate felony where the "same evidence" was not used to prove both the mob action and the killing. See *Davis*, 213 Ill. 2d at 474; *Davison*, 236 Ill. 2d at 241-42. While that description was appropriate in those cases to support the holding reached, this court did not create a test separate from the merger rule described above.

riot and affray, predecessors to the offense of mob action, is "not any injury to persons or property that might ensue, but rather the present breach of the public peace and the attendant risk of terror or alarm that the violent or tumultuous behavior might cause"); *Commonwealth v. Simmons*, 29 Ky. (1 J.J. Marsh.) 614, 615 (1831) (explaining that "as to riots, routs, unlawful assemblies and affrays," the "gravamen is the disturbance of the public peace, and the incitement to disorder").

¶ 52    Indeed, we have recognized that in the offense of mob action "there might not exist a particular aggrieved or offended person" because the offense "may be committed by unreasonably affronting the public at large." *In re B.C.*, 176 Ill. 2d at 549; see *Davis*, 213 Ill. 2d at 474 ("In essence, to convict defendant of mob action, it was not necessary to prove that defendant struck [the victim], much less performed the act that caused the killing."); see also *Simpkins*, 48 Ill. 2d at 107, 109 (upholding a mob action conviction, despite no proof of any injuries, where one group marched down the street to confront another group in a manner reasonably capable of inspiring fear of injury or harm). Because the essential characteristic of mob action is not an act of physical violence that contemplates death, the merger rule does not prohibit the use of mob action as a predicate felony.

¶ 53    In sum, we retain the merger doctrine. Under the merger doctrine, "where the acts constituting forcible felonies arise from and are inherent in the act of murder itself, those acts cannot serve as predicate felonies for a charge of felony murder." *Morgan*, 197 Ill. 2d at 447. A forcible felony is inherent in the murder where the essential characteristic of the forcible felony is an act of physical violence that contemplates death. Where the gravamen of the predicate felony does not contemplate an act of physical violence resulting in death, the merger rule does not apply. The gravamen of mob action does not contemplate an act of physical violence resulting in death, and thus, mob action properly served as the predicate felony for defendant's felony murder conviction.

¶ 54   C. Gabe's Statements in the Rap Video Should Have Been
Admitted as Prior Inconsistent Statements, But the Error in
Excluding the Statements Was Harmless

¶ 55   Defendant next argues that the trial court erred in denying his motion *in limine* to admit Gabe's statements made in a rap video as prior inconsistent statements. Defendant urges this court to reject the appellate court's "work-of-art exception." Defendant asks us to reverse his convictions and remand the cause for a new trial because, without the impeachment evidence, his trial was "fundamentally unfair." The State responds that the trial court properly questioned the reliability of the statements because they were part of an "artistic expression." The State further argues that any error in excluding Gabe's statements was harmless because the statements were cumulative to other evidence introduced at trial.

¶ 56   Procedurally, the parties agree that the issue is preserved for review. However, our review of the record shows that defendant did not include this claim in his posttrial motion, which would typically result in forfeiture. *People v. Denson*, 2014 IL 116231, ¶ 18 ("[T]o preserve an issue for review, a defendant must raise it in either a motion *in limine* or an objection at trial, and in a posttrial motion." (Emphases omitted.)). However, the State has not made a forfeiture argument. See *People v. Skillom*, 2017 IL App (2d) 150681, ¶ 24 (holding that the State may forfeit its forfeiture argument by failing to raise it). Thus, we will address the issue as if preserved.

¶ 57   "Generally, evidentiary motions, such as motions *in limine*, are directed to the trial court's discretion, and reviewing courts will not disturb a trial court's evidentiary ruling absent an abuse of discretion." *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 58   To start, the State seems to concede that Gabe's statements in the video satisfy the conditions in section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2018)). Section 115-10.1 provides that

"evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

\*\*\*

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

\* \* \*

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording." *Id.*

¶ 59    We agree that the statutory prerequisites for the admission of a prior inconsistent statement were met. At trial, Gabe continuously testified that he could not recall details from the day of the shooting. See *People v. Flores*, 128 Ill. 2d 66, 88 (1989) (explaining that prior statements may be "inconsistent" with trial testimony based on a witness's "professed memory loss"). Gabe was "subject to cross-examination" regarding the prior statements where he was placed on the witness stand, under oath, and responded willingly to questions. See *People v. Lewis*, 223 Ill. 2d 393, 404 (2006). Gabe's statements in the video narrate and describe the events leading up to and including the shooting at issue here. Finally, there does not appear to be any basis to dispute the accuracy of the recording.

¶ 60    Notwithstanding satisfaction of the statutory prerequisites, the trial court declined to admit the statements because it was a "couple guys doing a rap video." The court reasoned that there was not a "guarantee" or "close to a guarantee" of the "necessity to be honest." The appellate court similarly rejected defendant's argument on the admissibility of Gabe's prior statements, concluding that "the rap video was made solely for entertainment purposes and was not akin to a prior statement by the witness."

¶ 61    The trial court's decision was arbitrary because it was based on the purported platform of the statements, a rap video, as opposed to the substance of the statements. See *Holmes v. State*, 306 P.3d 415, 419 (Nev. 2013) (recognizing that while a rap video " 'may employ metaphor, exaggeration, and other artistic devices,' " those features do not make lyrics inadmissible where "the lyrics describe details that mirror the crime charged" (quoting Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 Colum. J.L. & Arts 1, 14 (2007))). There is no work-of-art exception in section 115-10.1. Thus, the trial court erred when it excluded the statements on that basis.

¶ 62    The proper approach is to treat prior statements the same way a trial court treats the admissibility of any piece of evidence. "All relevant evidence is admissible, except as otherwise provided by law." Ill. R. Evid. 402 (eff. Jan. 1, 2011). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). And, while there are bases to exclude otherwise relevant evidence (see Ill. R. Evid. 403 (eff. Jan. 1, 2011)), reliability is not one of those bases. Notably, unlike section 115-10 of the Code, which requires the trial court to find that the prior statement provides "sufficient safeguards of reliability" before it is admissible, section 115-10.1 contains no such requirement. Thus, the trial court's focus should be on relevancy as opposed to reliability. See *People v. Mertz*, 218 Ill. 2d 1, 79 (2005) (rejecting the defendant's argument that a jailhouse confession should have been excluded as unreliable because "the best way to ensure reliability" is to subject the declarant to cross-examination); see also *People v. Fillyaw*, 2018 IL App (2d) 150709, ¶ 60 (holding that the trial court's skepticism of a witness's recantation was not a proper basis for exclusion; the recantations' reliability was a question for the jury to decide).

¶ 63    Our conclusion that reliability is not a proper basis to exclude a prior inconsistent statement is further supported by comparing this case to *People v. Cross*, 2021 IL App (4th) 190114, relied upon by the State. There, the defendant sought to admit statements of a third party made in a rap video. *Id.* ¶¶ 139-40. The defendant sought to admit the statements as a confession under the hearsay exception for statements against penal interest. *Id.* ¶ 123. Under Illinois Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011), a statement tending to expose the declarant

to criminal liability is not admissible in a criminal case "unless corroborating circumstances clearly indicate the trustworthiness of the statement." Thus, the court in *Cross* had to grapple with the reliability of the out-of-court statement. Here, on the other hand, after defendant established each statutory requirement for admission, there was no further need to establish reliability.

¶ 64    Having determined that the proper focus is the relevance of the prior statement, we next consider what factors should be considered in determining the admissibility of song lyrics. Some courts have held that a prior statement made in the context of a music video is admissible where the statement bears a "strong nexus" to the "circumstances of the underlying offense for which a person is charged." *State v. Skinner*, 95 A.3d 236, 239 (N.J. 2014). Other courts have separated statements made in music videos into categories of "admissible statements of historical fact" and "inadmissible works of fiction." *Hannah v. State*, 23 A.3d 192, 197 (Md. 2011). Both approaches help to determine whether statements made in a music video are relevant to a particular case.

¶ 65    Here, Gabe's statements in the video bear a "strong nexus" to the events at issue. Gabe starts by stating that what he is about to say is a "true story" and "true facts." Gabe then states that the shooting occurred on May 17, the day of the shooting, and involved "Wheezy," which was Jones's nickname. Gabe then describes how he came to be at Roberson's residence at the time of the shooting, stating that he was picked up by his brother Gulley and was ready to go. Gabe states that his group of four was posted in the driveway, inferentially indicating that they were ready to fight or defend Roberson's property. In short, Gabe's statements were statements of historical fact. The statements were relevant because they were directly related to the events at issue in this case. The exclusion of the statements was an abuse of discretion.

¶ 66    We next address whether the erroneous exclusion of the statements was a harmless error.

> "This court has recognized three approaches to determine whether an error such as this is harmless beyond a reasonable doubt: (1) whether the error contributed to the defendant's conviction; (2) whether the other evidence in the case overwhelmingly supported the defendant's conviction; and (3) whether the

excluded evidence would have been duplicative or cumulative." *People v. Lerma*, 2016 IL 118496, ¶ 33.

The exclusion of Gabe's prior statements was harmless, as they were cumulative to other evidence introduced at trial.

¶ 67    As defendant argues, the music video "closely resembled the actual events" described at trial. Gulley testified that, when he was returning to Roberson's house, he "was ready to fight" and "wanted to fight." In fact, Gulley testified that he would "fight now" in the middle of trial. There was also evidence that Gulley struck members of Price's group earlier in the day. Gulley admitted that he threatened a member of Price's group who had gotten out of a car with a stick. Gulley testified that he was in the driveway "to see who [was] fixing to run up to my driveway." Gulley stated that he "would have rather fight than them shoot." In short, each relevant statement from the music video would have been cumulative to evidence that was presented at trial. Thus, the trial court's error in excluding the evidence was harmless and did not affect defendant's right to a fair trial.

¶ 68                          D. Defendant Failed to Establish Clear or
                          Obvious Error Where the Trial Court Did
                            Not *Sua Sponte* Remove Juror Proctor

¶ 69    Defendant's final argument is that the trial court erred when it allowed a juror to remain on the jury after the juror disclosed that her daughter was married to the mother of Nate and Gabe Gulley. Defendant maintains that the juror suffered from an implied bias due to her relationship to the Gulley brothers, a bias which required her dismissal from the jury despite the juror's description of her relationship to the Gulleys as nonexistent and the juror's assurances that she could be fair and impartial. The State responds that there was no evidence of implied bias because the relationship did not fall within one of the extraordinary situations where bias may be presumed.

¶ 70    Defendant did not preserve this issue for review because trial counsel failed to object to juror Proctor's continued presence on the jury. *Denson*, 2014 IL 116231, ¶ 18 ("[T]o preserve an issue for review, a defendant must raise it in either a motion *in limine* or an objection at trial, and in a posttrial motion." (Emphases omitted.)).

- 22 -

Considering this forfeiture, defendant requests that we review the issue for plain error and ineffective assistance of counsel.

¶ 71    When a defendant has failed to preserve an error for appeal, we may review the issue for plain error. *People v. Sebby*, 2017 IL 119445; Ill. S. Ct. R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). Plain error relief is appropriate (1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step under either prong of plain error analysis is to determine whether a "clear or obvious" error occurred.

¶ 72    We recently clarified the standard of review in a claim of juror bias.

"Regardless of whether the objecting party alleges actual bias or implied bias, the juror's relationship to the parties is a question of fact to be answered from the evidence, and the court's finding regarding the relationship should not be reversed unless it is against the manifest weight of the evidence." *Ittersagen v. Advocate Health & Hospitals Corp.*, 2021 IL 126507, ¶ 51.

"In certain extraordinary situations, a juror's bias may be implied from his or her relationship with a party or other trial participant." *Id.* ¶ 47. Whether the juror's relationship to a party or other trial participant supports a presumption of bias is a question of law that we review *de novo*. *Id.* Thus, we defer to the trial court's assessment of the juror's credibility and findings regarding the nature of the juror's relationship to a party or other trial participant. Then we decide as a matter of law whether, under those facts, the juror suffers from an implied bias.

¶ 73    "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). To that end, a defendant is entitled to a trial by a panel of impartial jurors. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). A biased juror is not an impartial juror. "The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter

of law." *United States v. Woods*, 299 U.S. 123, 133 (1936). Defendant here does not claim that juror Proctor was actually biased. Instead, he claims only that juror Proctor suffered from an implied bias, a bias that should be legally presumed based on her relationship to the Gulley brothers.

¶ 74 This court has recognized that "there are certain relationships which may exist between a juror and a party to the litigation which are so direct that a juror possessing the same will be presumed to be biased and therefore disqualified." *People v. Cole*, 54 Ill. 2d 401, 413 (1973) (explaining that at "common law a juror was presumed to be biased and therefore disqualified if he was related to a party to the litigation through blood or sanguinity or through certain indirect personal relationships"). We presume that bias exists only in " 'extraordinary situations.' " *Ittersagen*, 2021 IL 126507, ¶ 47 (quoting *Smith v. Phillips*, 455 U.S. 209, 222 n.* (1982) (O'Connor, J., concurring)). Whether a juror's relationship to one of the parties or trial participants falls within the class of "extraordinary situations" depends on the "degree of closeness" of the relationship. *Id.* ¶ 68.

¶ 75 We have yet to identify the point at which a familial relationship will give rise to a legal conclusion of implied bias. Many courts have adopted the position in Justice O'Connor's special concurrence in *Smith*, 455 U.S. at 222, that one situation where an implied bias finding is justified is if a juror is a "close relative of one of the participants in the trial or the criminal transaction." See *United States v. Mitchell*, 690 F.3d 137, 147 (3d Cir. 2012). In adopting the "close relative" standard, the Third Circuit Court of Appeals held that the "touchstone of the inquiry *** is whether the average person in the position of the juror would be prejudiced and feel substantial emotional involvement in the case." *Id.* at 146. "A distant relative, on average, is unlikely to harbor the sort of prejudice that interferes with the impartial discharge of juror service." *Id.* "On the other hand, the bond between close relatives is intimate enough, on average, to generate a stronger likelihood of prejudice, whether unconscious or intentionally concealed." *Id.*

¶ 76 Step-grandparent, standing alone, is not a sufficiently close relationship to warrant finding a presumption of bias. See *Stanfield v. Frink*, No. CV 12-45-BU-DLC-CSO, 2015 WL 809464 (D. Mont. Feb. 25, 2015) (the relationship of step-grandmother is not necessarily so close as to be sufficient for the presumption of bias, but it very well could be, depending on the circumstances). We are reluctant

to create a bright line category of individuals to which an implied bias will be imputed because a finding of implied bias cannot be rebutted by even the strongest proof of a juror's impartiality. The better approach, when a defendant raises a colorable claim of juror bias, is to investigate the closeness of the relationship to determine whether a prospective juror suffers from an implied bias. This inquiry will often depend on the totality of the circumstances. See *Ittersagen*, 2021 IL 126507, ¶ 68. If additional questioning establishes that an average person in the position of the juror would be prejudiced and feel substantial emotional involvement in the case, then the trial judge should conclude, despite any assurances to the contrary, that the juror suffers from an implied bias.

¶ 77    Here, the substance of juror Proctor's relationship with the Gulley brothers existed in title only. In other words, while juror Proctor was labeled as a step-grandmother, it is almost certain that she did not consider herself a step-grandparent to the Gulley brothers. Juror Proctor testified during additional *voir dire* that, while her daughter was married to the mother of Gabe and Nate Gulley, she had never met Nate Gulley, she did not know he was involved in the underlying events before he testified, and she did not recognize the Gulley name during the initial *voir dire* because she did not "talk to them like that."

¶ 78    Based on the nonexistent relationship between juror Proctor and the Gulley brothers, the trial court did not commit a "clear or obvious" error in allowing juror Proctor to remain on the jury. The trial court took the appropriate step in questioning juror Proctor about the relationship after a colorable claim of juror bias came to light. The further questioning did not establish that an average person in juror Proctor's position would be prejudiced and feel substantial emotional involvement in the case.

¶ 79    Defendant has also failed to prove an ineffective assistance claim. An ineffective assistance of counsel claim requires a defendant to establish "both that counsel's performance fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Gayden*, 2020 IL 123505, ¶ 27; *Strickland v. Washington*, 466 U.S. 668 (1984). "A defendant's trial attorney cannot be considered ineffective for failing to raise or pursue what would

have been a meritless motion or objection." *People v. Pingelton*, 2022 IL 127680, ¶ 60.

¶ 80        The trial court signaled to trial counsel that a request to remove juror Proctor from the venire would have been meritless when the court stated that juror Proctor "stays on the jury" and that it was not "a close call." Defendant has not established that trial counsel performed deficiently based on the high probability that any request to remove juror Proctor would have failed. As defendant has not satisfied the deficient performance prong, his ineffective assistance claim lacks merit. See *Gayden*, 2020 IL 123505, ¶ 27 ("The failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel.").

¶ 81                          III. CONCLUSION

¶ 82        We conclude as follows: (1) the State proved defendant guilty of mob action beyond a reasonable doubt; (2) mob action properly served as the predicate felony for defendant's felony murder conviction; (3) the trial court's exclusion of the prior inconsistent statements in Gabe's rap video, while error, was harmless; and (4) no clear or obvious error occurred when the trial court did not *sua sponte* remove juror Proctor from the jury. We therefore affirm defendant's convictions.

¶ 83        Judgments affirmed.

¶ 84        Cause remanded.

¶ 85        JUSTICE O'BRIEN took no part in the consideration or decision of this case.