NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241022-U

NO. 4-24-1022

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 19, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| TROY McKINNEY, | ) | No. 21CF561 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Paul P. Gilfillan, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Presiding Justice Harris and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding (1) the evidence was sufficient to convict defendant of being an armed habitual criminal, (2) defendant was not denied a fair trial, and (3) defendant was not denied the effective assistance of trial counsel.

¶ 2    Defendant, Troy McKinney, appeals from his conviction for being an armed habitual criminal (AHC) (720 ILCS 5/24-1.7 (West 2020)). Defendant raises three issues on appeal. First, defendant argues the State failed to prove him guilty of AHC beyond a reasonable doubt. Second, defendant asserts the trial court misrepresented certain evidence to the jury and thereby deprived him of his constitutional right to a fair trial. Finally, defendant contends his trial counsel was ineffective for failing to (1) adequately communicate with defendant and discuss the discovery with him, (2) subpoena certain evidence, and (3) object to the court's alleged misrepresentations of other evidence. The State responds the evidence was sufficient to convict defendant for AHC, the court did not misrepresent any evidence, and defendant was not denied

the effective assistance of counsel. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The underlying facts of this case were discussed in *People v. McKinney*, 2023 IL App (4th) 220356-U. Accordingly, we discuss only those facts necessary to resolve the issues presented in this appeal.

¶ 5                                    A. The Charges

¶ 6        In November 2020, the State charged defendant by information in Peoria County case No. 20-CF-671 with one count of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2020)) and domestic battery (*id.* § 12-3.2(a)(2)). Following a preliminary hearing and arraignment, Michael Doubet was appointed to represent defendant. The State dismissed the two charges in August 2021 after offering defendant a plea agreement that he did not accept.

¶ 7        In September 2021, the State charged defendant by indictment in the instant case with AHC, a Class X felony (*id.* § 24-1.7(a)) (count I); unlawful possession of a weapon by a felon, a Class 2 felony (*id.* § 24-1.1(a)) (count II); and domestic battery, a Class 4 felony (*id.* § 12-3.2(a)(2)) (count III). The charges stemmed from the same events that precipitated the charges in case No. 20-CF-671. With respect to count I, the indictment alleged defendant possessed a firearm on November 26, 2020, after being previously convicted of robbery in 1995 and unlawful possession of a weapon in 2009. Defendant was 17 years old when he was convicted of robbery.

¶ 8                                    B. Jury Trial

¶ 9        In January 2022, the trial court, specifically Judge Lyons, conducted the jury trial. A summary of the evidence presented at trial follows.

¶ 10       On November 26, 2020, around 1:25 a.m., police were dispatched to the home of

- 2 -

Santanya Adams to investigate a domestic dispute. According to Timothy Moore, an investigator for the Peoria County State's Attorney's Office, the female caller who contacted the police indicated the man involved in the domestic dispute kept a gun—specifically, a black revolver in a black and red bag—in his vehicle. The trial court admitted into evidence video from Officer Andrew Gillespie-Connor's body-worn camera. In the video, a man and a woman can be heard yelling as Officer Connor walks up the driveway. Defendant was outside the residence, near his white Chevrolet Suburban. Defendant complies with the officer's demand that he walk forward, and is taken into custody. Officer Connor then asks Officer Brandon Walton to search the Suburban. Officer Walton found no contraband in the Suburban. However, in an area just a few feet away from the Suburban, Officer Walton discovers a black and red bag with a .38-caliber revolver and ammunition inside of it. Upon entering the home to speak with Adams, officers found Thanksgiving groceries all over the floor and the kitchen in disarray.

¶ 11          Adams testified, during the early hours of November 26, 2020, she called the police to her home. When asked why she called the police, Adams responded she and defendant had gotten into an "altercation." Adams claimed "[defendant] shoved me and tried to take my food out [of] the house." According to Adams, the two had purchased groceries together for Thanksgiving. After getting into an argument, a physical struggle over a bag of groceries ensued, wherein defendant pushed her. After he pushed her, Adams saw defendant leave the house and enter the backyard. Adams also testified she knew defendant owned a gun, which he kept in a black and red bag. On cross-examination, the following exchange occurred:

"Q. [By Mr. Doubet] So prior to your out—you're alleging that [defendant] pushed butter on you, right?

A. The butter, in a little—altercation—as I was trying to get bags, you know,

the butter—I don't—the butter got on me.

THE COURT: I think her testimony was she wound up with butter on her, but—

MS. ADAMS: Yes.

THE COURT: —it happened somewhere along the way.

MR. DOUBET: Okay.

MS. ADAMS: Right.

Q. [By Mr. Doubet] So prior to him making contact with you, you were reaching to get stuff from him, right? You started the contact?

A. No, he did it first.

Q. How did he touch you first when you said that he was taking the groceries out and you grabbed for them?

A. That's what happened. He tried to leave the house with all the groceries. He had some in his hands. I was getting the bags. But we were already in the house having an altercation. So. And when he tried to leave, he got in refrigerator, and got the stuff, tried to go out the backdoor with it.

Q. And you tried to stop him?

A. I didn't try to stop him. I tried to get my items back.

Q. Were the groceries walking out by themselves?

MR. GAST [(ASSISTANT STATE'S ATTORNEY)]: Judge, I'm going to object. I mean, this is—that's argumentative.

THE COURT: All right. I think we know what's happened here. And, in fact, I think the witness testified that the argument really didn't even start there. It

- 4 -

sort of continued there after they got home. So let's not fill in the gaps for her. And she's allowed to say what she wants, but *** her items didn't walk out by themselves. And let's—let's stay on the path. And the path is that we're at the point where she thinks he's taking groceries away that he shouldn't be taking and she wants them back. Pick it up from there.

MR. DOUBET: Okay.

Q. [By Mr. Doubet] And so he eventually just went outside, correct?

A. Yeah, he went out the backdoor.

Q. Did he *** leave with anything?

A. Because I called the police, he—

Q. Okay. You called the police once he went outside?

A. I'm not sure.

THE COURT: She said, 'He went outside because I called the police.' That was her answer.

MS. ADAMS: Okay.

MR. DOUBET: Okay."

Towards the end of cross-examination, the court responded to the State's objection during the following exchange:

"Q. Well, your testimony was earlier that you said [defendant] had kept [a gun] in [a black and red bag], but you didn't say he had anything with him or tried to use anything during this tussle that you had, correct?

A. No. He didn't try to hurt me, like, kill me, or anything, no.

Q. So you were upset. You wanted to make sure that the police came and

- 5 -

took [defendant] away, right?

A. No, but he put his hands on me, so I called the police.

Q. Well, you put your hands on him first, though, correct?

A. No, I did not.

Q. Then how did you grab a bag?

MR. GAST: Judge, I'm going to object. That's—

THE COURT: We went down this—she was talking about there was a confrontation. She reached to take her things. If you want to characterize it as she hit him first and—and this is a contract case, then fine, we'll go to civil court. But she indicates she was grabbing her things and then that's when the drama happened. So let's go from there.

MR. DOUBET: I have nothing further, Judge."

¶ 12　　　　　Following closing arguments and deliberations, the jury found defendant guilty of AHC and unlawful possession of a weapon by a felon. The jury found him not guilty of domestic battery.

¶ 13　　　　　　　　　　　C. Posttrial Proceedings and Initial Appeal

¶ 14　　　　　On February 9, 2022, defendant *pro se* filed a motion for a new trial, a motion in arrest of judgment, and a revised motion for a new trial. Defendant alleged, *inter alia*, he was denied the effective assistance of counsel in several respects. Specifically, defendant alleged defense counsel failed to (1) review discovery with him, (2) impeach the State's witnesses, (3) move to suppress illegally seized evidence, and (4) introduce evidence of Adams's 911 call.

¶ 15　　　　　On March 7, 2022, defense counsel filed a motion for new trial, which adopted only a portion of defendant's *pro se* motion that challenged the sufficiency of the State's evidence.

- 6 -

Defense counsel additionally asserted defendant was denied due process and the equal protection of the law and the trial court erred when it denied his motion for a directed verdict.

¶ 16        At the posttrial motions hearing, Judge Lyons conducted an inquiry into defendant's *pro se* claims of ineffective assistance of counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). After a lengthy back and forth between defendant and the court, the court found defendant's claims were "facially insufficient," "conclusory," and "not supported by [defendant's] remarks or by the Court's recollection of the facts or of the procedure that's happened." The court therefore declined to appoint new counsel to further investigate defendant's ineffective assistance claims.

¶ 17        The trial court then denied defense counsel's motion for a new trial. In sentencing defendant, the court found his conviction for unlawful possession of a weapon merged with the AHC conviction. Accordingly, the court sentenced defendant only on the AHC conviction to nine and a half years in prison.

¶ 18        On his initial appeal, defendant argued he was entitled to remand for a complete and neutral *Krankel* inquiry. *People v. McKinney*, 2023 IL App (4th) 220356-U, ¶ 32. This court found (1) the trial court's *Krankel* inquiry was inadequate and (2) the record showed defense counsel possibly neglected the case. *Id.* ¶¶ 36-37. Accordingly, we remanded the case with directions new counsel be appointed to represent defendant and to present his ineffective-assistance claims to the court. *Id.* ¶ 50.

¶ 19                                D. Remand

¶ 20        On remand, *Krankel* counsel for defendant filed a new posttrial motion, arguing defendant was entitled to a new trial. The motion asserted (1) defendant was denied a fair trial based on the trial court's mischaracterization of Adams's testimony and opining upon the same

and (2) defendant's trial counsel was ineffective. With respect to the second issue, the motion claimed trial counsel was ineffective when he failed to (1) properly communicate and review discovery with defendant, (2) investigate and subpoena Adams's 911 call, and (3) object to the trial court's alleged mischaracterization of Adams's testimony. During a status hearing following the filing of the motion, *Krankel* counsel indicated to the court that she attempted to subpoena Adams's 911 call but was unsuccessful, noting the police only kept such calls for one year.

¶ 21　　　　On July 24, 2024, a different judge conducted a hearing on *Krankel* counsel's new posttrial motion. Defendant testified his trial counsel, Doubet, met with him at court once when the original 2020 case was filed and asked him if he wanted to plead out. According to defendant, Doubet advised him that if he did not do so, he would be charged with AHC. He further testified Doubet did not show him the discovery or summarize it for him but he had seen the police report. After the charges in the present case were filed, he only saw Doubet once, which was a few days before trial. On that occasion, Doubet told defendant he did not have the discovery with him. Defendant testified he tried to call Doubet repeatedly. However, on cross-examination, the State showed defendant his jail call logs and there was no record of defendant trying to call Doubet.

¶ 22　　　　Doubet testified he showed defendant discovery at a pre-trial hearing for the initial case, where he had highlighted portions of the police report. However, Doubet admitted he did not go over the evidence with defendant again when the case was refiled about a year later. Doubet claimed there was "not much to go over at that point. Just kind of reviewed [it] and we're ready for trial." He later reiterated, "we may not have discussed it again in the second part, but we were ready to go to trial the first time." He also explained he did not subpoena the 911 call from Adams because he did not believe it would be helpful. In Doubet's experience, "especially on cases with domestic battery, on a 9-1-1 call from a victim in most instances you've got a victim that will

usually ramble on about that this is—I'm tired of this person beating me, they've done it 15 times before, and I'm sick of this." Doubet continued, "And so you get a lot of things in there that you really wouldn't want to play in front of a jury because it opens the door for something else to come in that you just don't want." Regarding his cross-examination of Adams, Doubet explained,

> "It was difficult because Ms. Adams was not wanting to answer my question about being the aggressor, and she was making comments that [defendant] had laid hands on her, but it really came out in the testimony that he was trying to leave with the food, and she tried to stop him from leaving, but she would never admit that she actually touched him first. So, we kept going back and forth with that, that she actually touched him."

Doubet also found the cross-examination difficult because "Judge Lyons would interject and kind of give a running analysis of what he thought had been said and then tell me to pick up from there." Doubet elaborated,

> "I think it probably happened three or four times where Judge Lyons would stop me. He would give a recount to the jury about where we were at and say, okay, we know this, we know this, move on, go from here, and I wasn't done with where I was setting the case up for, but I had to move on because Judge Lyons had basically told the jury, here's what was said, and this is what we know now, so move on."

When asked why he did not object to the trial court mischaracterizing Adams's testimony for the jury, Doubet responded,

> "[I]t would certainly not endear me to the Court if I'm telling the Court that they're wrong; and that they just instructed the jury in something that wasn't said. I didn't think that would bode well for us, and so I was going to try to keep asking the

questions and find another way to get there, but I never quite got there the way I wanted to."

¶ 23 Following arguments, the trial court denied the motion. The court reasoned there was an explanation for the alleged lack of communication between defense counsel and defendant: the case was a simple one involving very little evidence, and defense counsel had already gone over the small amount of discovery when the case was initially filed in December 2020. The court found Doubet's testimony he had, in fact, discussed the discovery with defendant to be credible. Regarding the 911 call, the court reiterated the call itself no longer existed. The court also accepted Doubet's explanation for not subpoenaing the call, which was that he did not believe it would be helpful to defendant's case. Finally, with respect to Judge Lyons's allegedly improper comments, the court stated,

"As to [Doubet's] failure to correct the judge for improperly interjecting in the case, that's a more touchy topic and more difficult *** situation to deal with. ***

Counsel—trial counsel did indicate that he challenged the credibility of Witness Adams in his closing arguments. [Adams's] statement herself at trial that she wasn't sure when the call was made and where the defendant was is a matter of record and was fair game for the *** Defense Attorney to comment about. I understand why he didn't follow-up on the spur of the moment when the judge made that comment, but to him, the Defense Attorney, it just wasn't that big of a deal. That was the big interjection by the Court, one of the few.

The other comments that are [c]ited by Defense Counsel in the motion are interjections? Yes. Inappropriate? Yes. Substantively as significant as the first

comment we've just addressed? No. Comments about where butter ended up on the victim, where the argument started, drama occurring, and the judge even making a comment that was helpful to the Defense. If you want to characterize it as she hit him first, then fine, we'll go to civil court, yada yada.

So, the judge's comments cut both ways. Unfortunate that it occurred, but the real issue is did that impact the case because of the defendant's failure to challenge the judge on the spot there? And in a close call I come down on the side that it did not impact the case such that any ineffective assistance for challenging it was not or—would not have changed the outcome of the case or any arguments that could have been made."

¶ 24    This appeal followed.

¶ 25                                II. ANALYSIS

¶ 26    Defendant presents three arguments on appeal.

¶ 27    First, defendant asserts the State failed to prove him guilty of AHC. Specifically, defendant contends his 1995 robbery conviction cannot be used as a predicate offense for AHC because he was only 17 years old at the time of conviction, and under the current law, the charge would have been resolved in juvenile court. The State responds defendant's 1995 robbery conviction was a qualifying predicate offense under the AHC statute despite defendant's age at the time of conviction.

¶ 28    Second, defendant argues the trial court's summarizations of Adams's testimony mischaracterized the evidence against him by engaging in inappropriate factfinding before the jury and deprived him of a fair trial. The State claims the court's remarks did not deprive defendant of a fair trial.

¶ 29    Finally, defendant claims he was denied the effective assistance of his trial counsel because trial counsel failed to (1) adequately communicate and discuss the discovery with defendant, (2) object to the trial court's alleged mischaracterization of the evidence, and (3) subpoena Adams's 911 call. The State responds trial counsel's performance was not deficient and defendant nonetheless cannot demonstrate prejudice resulting from counsel's allegedly deficient performance.

¶ 30                              A. AHC Conviction

¶ 31    We first address defendant's claim the State failed to prove defendant committed the offense of AHC beyond a reasonable doubt. (We note the AHC statute was amended as of January 1, 2025, renaming the offense to "unlawful possession of a firearm by a repeat felony offender." See Pub. Act 103-822 § 20 (eff. Jan. 1, 2025) (amending 720 ILCS 5/24-1.7). We use the term AHC to reflect the name of the offense at the time of defendant's conviction.)

¶ 32    To convict defendant of AHC in this case, the State was required to prove beyond a reasonable doubt that defendant received, sold, possessed, or transferred any firearm after having been convicted a total of two or more times of any combination of the following offenses: "(1) a forcible felony as defined in Section 2-8 of this Code [(720 ILCS 5/2-8 (West 2020))]; [and] (2) unlawful use [or possession] of a weapon by a felon." 720 ILCS 5/24-1.7 (West 2020).

¶ 33    Defendant does not dispute that his 2009 conviction for unlawful possession of a weapon by a felon qualifies as a predicate offense under the statute and challenges only the 1995 robbery conviction. While acknowledging robbery is generally considered a forcible felony under section 2-8 of the Criminal Code of 2012 (Code) (*id.* § 2-8), defendant relies on the grammatical tense of the statute and recent caselaw for the proposition that "society's evolving attitudes towards crime and punishment support a finding that an offense committed when the defendant was a

- 12 -

juvenile does not qualify as a predicate felony offense for the present AHC offense." Defendant alternatively argues that should this court find the AHC statute ambiguous, the rule of lenity dictates this ambiguity must be resolved in defendant's favor.

¶ 34    After briefing concluded in this case and prior to oral arguments, the Illinois Supreme Court issued an opinion in *People v. Wallace*, 2025 IL 130173, which we find dispositive of this issue. In *Wallace*, the defendant was found guilty of AHC where the two predicate offenses consisted of a 2008 conviction for armed robbery with a firearm and a 2015 conviction for unlawful use of a weapon by a felon. *Id.* ¶ 6. The defendant was 17 years old at the time of his 2008 conviction for armed robbery. *Id.* ¶ 8. On appeal to the First District, the defendant argued his AHC conviction should be reversed because, due to amendments to the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2014)), the conduct leading to his 2008 conviction for armed robbery would have resulted in a juvenile adjudication if it had been committed in 2019, the year of his arrest for AHC. *Wallace*, 2025 IL 130173, ¶ 8. Therefore, the defendant's argument continued, his 2008 conviction could not serve as a predicate offense for AHC. *Id.* The First District rejected this argument, and the supreme court affirmed. *Id.* ¶ 1. The supreme court reasoned as follows:

> "[The defendant] is contending that, whenever the State seeks to prove a predicate conviction under the statute, it must either establish that the defendant was 18 years old at the time the prior offense was committed or, if the defendant was younger, that the State must engage in a 'mini-trial' regarding the prior offense to establish that the defendant would have been transferred to criminal court, had he committed the predicate offense under the present discretionary transfer scheme. [The defendant] would have us hold that the legislature intended this statutory scheme

- 13 -

even though there is no mention in the [AHC] statute about establishing the age of the defendant, no mention of the Juvenile Court Act, and no mention of how a 'mini-trial' regarding the prior offense would be conducted or how a jury could be expected to make the legal judgment as to whether the defendant would have been transferred to criminal court. Instead, according to [the defendant], solely because the statute uses present tense terms, we must assume that the legislature intended the incorporation of the current juvenile adjudication scheme into the armed habitual criminal statute. That simply is not a reasonable reading of the statutory language.

As the State explains, the legislature's use of present tense phrases such as 'a forcible felony as defined in Section 2-8 of this Code' means only that the trial court must determine whether the predicate conviction is for an offense that is statutorily defined as a forcible felony under the current version of the Criminal Code of 2012, that is, the Criminal Code that is in existence at the time the defendant was charged with [AHC]. The use of the present tense does not mean that the Juvenile Court Act's discretionary transfer scheme is incorporated into the [AHC] statute. [Citations.]" *Id.* ¶¶ 19-20.

¶ 35    Here, defendant's challenge to his AHC conviction is nearly identical to the one rejected in *Wallace*, and we conclude it fails for the same reasons set forth therein. There is no dispute defendant's 1995 robbery conviction qualifies as a forcible felony under the AHC statute despite his age at the time of the offense. In light of *Wallace* and in the absence of any other arguments the evidence was insufficient to convict defendant of AHC, we affirm.

¶ 36                    B. Trial Court's Characterization of the Evidence

¶ 37    Defendant next argues he is entitled to a new trial because the trial court improperly mischaracterized Adams's testimony before the jury and deprived him of his constitutional right to a fair trial. Specifically, defendant challenges the following statements from the Judge Lyons:

(1) "[Adams] said, 'He went outside because I called the police.' That was her answer."

(2) "All right. I think we know what's happened here. And, in fact, I think the witness testified that the argument really didn't even start there. It sort of continued there after they got home. So let's not fill in the gaps for her."

(3) "We went down this—she was talking about there was a confrontation. She reached to take her things. If you want to characterize it as she hit him first and—and this is a contract case, then fine, we'll go to civil court. But she indicates she was grabbing her things and then that's when the drama happened. So let's go from there."

The State responds the court's allegedly improper comments were within the scope of the court's authority to "clarify evidence, expedite the examination of witnesses, control cross-examination, and curtail repetition," and therefore no error occurred. We conclude no reversible error occurred.

¶ 38                                          1. *Due Process*

¶ 39    All criminal defendants are entitled to the due process of law, which includes the right to a fair trial. See U.S. Const. amend. XIV; Ill. Const. 1970, art. 1, § 2; see also *People v. Bush*, 2023 IL 128747, ¶ 73 ("A fair trial in a fair tribunal is a basic requirement of due process." (Internal quotation marks omitted.)). To ensure a fair trial, "[a] trial judge must exercise a high degree of care to avoid influencing the jury because jurors are 'ever watchful of the attitude of the trial judge and his influence upon them is necessarily and properly of great weight.' " *People v.*

- 15 -

*Young*, 248 Ill. App. 3d 491, 502 (1993) (quoting *People v. Sprinkle*, 27 Ill. 2d 398, 403 (1963)). In carrying out this duty, a trial judge retains authority to clarify the evidence or proceedings for the jury and "expedite" the trial. *People v. Minter*, 2015 IL App (1st) 120958, ¶ 123. The judge may also exercise its discretion to limit the scope of cross-examination (*People v. Garrett*, 276 Ill. App. 3d 702, 712 (1995)), eliminate confusion, and curtail repetition (*People v. Wells*, 106 Ill. App. 3d 1077, 1086 (1982)). However, the judge "must refrain from interjecting opinions, comments or insinuations reflecting bias toward or against any party." *People v. Sims*, 192 Ill. 2d 592, 636 (2000). "A trial judge's improper comments are reversible error if the defendant can establish that the comments were a material factor in his conviction or had a probable effect on the jury's verdict." *Garrett*, 276 Ill. App. 3d at 712.

¶ 40          Defendant argues this case is similar to *People v. Mitchell*, 228 Ill. App. 3d 167 (1992). In *Mitchell*, the defendant was convicted of murder on an accomplice liability theory and attempted robbery. *Id.* at 168. On appeal, the defendant argued the trial court's bias and improper remarks deprived him of a fair and impartial trial. *Id.* The First District agreed, and chronicled instances throughout the trial wherein the court (1) interrupted and undermined the impeachment of the State's complaining witness; (2) belittled or mocked defense counsel during a line of questioning relevant to whether the defendant's confession was coerced; (3) accused the defendant of making up a conversation about the circumstances leading to his interrogation with police; and (4) allowed the State to explain the law of accountability theory during opening statements but interrupted defense counsel's opening statement to prohibit him from stating the defendant was presumed to be innocent. *Id.* at 169-71. Accordingly, the First District reversed the defendant's convictions and remanded for a new trial.

¶ 41                    2. *Propriety of the Court's Comments*

¶ 42    We first address each of the challenged comments and consider whether any of them were improper.

¶ 43    To begin, we acknowledge the acrimonious exchange that occurred between defendant and the trial court (Judge Lyons) prior to trial in this case, which we discussed in detail in defendant's previous appeal. See *McKinney*, 2023 IL App (4th) 220356-U, ¶ 15. During that exchange, Judge Lyons (1) mocked defendant's request for a "scheduling conference," saying they could "call it a birthday party" for all he cared; (2) stated defendant's relationship with Doubet was "not so good"; and (3) responded to defendant's claim his attorney had not communicated with him as "ridiculous." While keeping this important context in mind, we focus our inquiry on whether Judge Lyons's allegedly improper comments *at trial* deprived defendant of a fair trial overall—*i.e.*, whether the comments likely contributed to the convictions or influenced the jury's verdict.

¶ 44    We agree with defendant that in the following exchange, the trial court's "summarization" of Adams's testimony was not accurate:

"MR. DOUBET: Okay.

Q. [By Mr. Doubet] And so [defendant] eventually just went outside, correct?

A. Yeah, he went out the backdoor.

Q. Did he—did he leave with anything?

A. Because I called the police, he—

Q. Okay. You called the police once he went outside?

A. I'm not sure.

THE COURT: She said, 'He went outside because I called the police.' That

- 17 -

was her answer."

The record shows Adams did not testify defendant went outside because she had called the police. Instead, Adams's testimony was that she was not sure of the timing of calling the police in relation to when defendant went outside. While the context might have supported an *inference* defendant went outside because Adams called the police, it was improper for the court to state such an inference as if it were fact and thereby invade the province of the jury. See *People v. Harris*, 2018 IL 121932, ¶ 26 ("The trier of fact remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts.").

¶ 45        However, the other comments challenged by defendant, which also occurred during Adams's testimony, did not rise to the level of mockery, belittling, accusations, or favoritism that were found to be present in *Mitchell*. Both of the comments defendant challenges arose when the court was called upon to address objections raised by the State, and we conclude they were permissible efforts to prevent repetitive lines of questioning and to reign in the scope of defense counsel's cross-examination of Adams.

¶ 46        Prior to the court's statement, "let's not fill in the gaps for [Adams]," the State objected to defense counsel asking, "Were the groceries walking out by themselves?" The court then briefly and accurately summarizes the last several responses from Adams, wherein she indicates the altercation did not begin while unpacking groceries—the groceries had been purchased earlier in the day and were already in the refrigerator before defendant allegedly attempted to take them. The court then advises counsel to "stay on the path." The court's response encouraged defense counsel to continue forward with cross-examination and refrain from asking repetitive questions; Adams had already testified several times that when defendant attempted to leave her home with the groceries, she grabbed for the bags. Defense counsel repeatedly insisted

to Adams that she initiated the physical contact with defendant, which she repeatedly denied.

¶ 47    Moreover, the final comment defendant challenges followed after defense counsel continued this same line of questioning about grabbing the groceries and who initiated the contact. The State again objected after the following colloquy:

"Q. So you were upset. You wanted to make sure that the police came and took [defendant] away, right?

A. No, but he put his hands on me, so I called the police.

Q. Well, you put your hands on him first, though, correct?

A. No, I did not.

Q. Then how did you grab a bag?"

The court then interjects,

"We went down this—she was talking about there was a confrontation. She reached to take her things. If you want to characterize it as she hit him first and— and this is a contract case, then fine, we'll go to civil court. But she indicates she was grabbing her things and then that's when the drama happened. So let's go from there."

(We note, as an aside, the court likely meant to say "tort case," rather than "contract case.") When viewed in context, the court was again properly exercising its discretion to curtail this repetitive line of questioning and expedite cross-examination. See *Garrett*, 276 Ill. App. 3d at 712 (holding the trial court properly limited the scope of cross-examination to prevent repetitive questions). Adams had already explained multiple times that she and defendant had been arguing, that he attempted to leave with bags of groceries, and that she grabbed for the bags. It is not improper, or an expression of bias, for the court to prevent a litigant from continuously reformulating the same

- 19 -

question multiple times to elicit a different and more favorable response.

¶ 48                                 3. *Reversible Error*

¶ 49            Having found only one of the trial court's challenged comments was improper, we consider whether the court's incorrect summary of Adams's testimony was either a material factor in defendant's convictions or had a probable effect on the jury's verdict. See *id.* Our review of the record and the evidence shows it was not. Although the court's comments disrupted defense counsel's attempt to undermine the State's theory that defendant knew about the impending arrival of the police, which prompted him to attempt to conceal the firearm, the other properly admitted evidence overwhelmingly supported defendant's convictions for AHC and unlawful possession of a weapon by a felon. Adams testified she knew defendant to possess a black revolver that he kept in a black and red bag, and which was typically in his vehicle. Investigator Moore confirmed this description of the revolver was provided to the dispatcher during the 911 phone call. Officer Connor's and Officer Walton's body-worn camera video showed officers had located a black and red bag containing a revolver outside the home, which matched the description provided to the dispatcher. Although the bag was found up against the garage of the neighboring residence, it was just a few feet away from the driver's side of defendant's Suburban. Given this plethora of circumstantial evidence, we conclude the court's improper mischaracterization of Adams's testimony was not a "material" factor in defendant's convictions and did not have a probable effect on the jury's verdict.

¶ 50                        C. Ineffective Assistance of Counsel

¶ 51            Finally, defendant argues he was denied his constitutional right to the effective assistance of his trial counsel. Specifically, defendant asserts he was prejudiced by counsel's failure to (1) adequately communicate with him and go over discovery, (2) subpoena Adams's 911

call, and (3) object to the court's allegedly improper comments and interjections during Adams's trial testimony.

¶ 52 The Illinois and United States Constitutions guarantee all criminal defendants the right to the effective assistance of counsel. See Ill. Const. 1970, art. 1, § 8; U.S. Const., amends. VI, XIV. To prevail on a claim of ineffective assistance of counsel, the defendant must show both that (1) his counsel's performance was deficient by objective professional standards and (2) but for counsel's unprofessional errors, there is a reasonable probability the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting the *Strickland* standard). The *Strickland* test is conjunctive, meaning a defendant's failure to satisfy either prong is fatal to an ineffective assistance claim. *People v. Enis*, 194 Ill. 2d 361, 377 (2000).

¶ 53 Typically, this court reviews a claim of ineffective assistance of counsel *de novo*. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88. However, if the trial court has "reached a determination on the merits of the defendant's *Krankel* motion, we will reverse only if the trial court's action was manifestly erroneous." *People v. Jackson*, 2020 IL 124112, ¶ 98. "Manifest error is error that is clearly evident, plain, and indisputable." *Id.* Moreover, *Strickland* also dictates that a reviewing court is to consider the totality of the evidence when considering the issue of prejudice:

> "Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is

more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-66.

¶ 54    Here, the trial court conducted an adversarial hearing with witness testimony following *Krankel* counsel's motion and reached a decision on the merits of the ineffective assistance claims. Accordingly, we review the court's ultimate determination for manifest error. See *Jackson*, 2020 IL 124112, ¶ 98.

¶ 55    First, Doubet's testimony, along with the evidence presented at trial, supported the court's conclusion the alleged lack of communication was easily explained by the case's simplicity. Doubet had already gone over the police report with defendant, discussed the potential issues, and had been ready to proceed to trial in the first case. This was not a case involving numerous witnesses, extensive forensic evidence, experts, or voluminous documents. The court specifically found Doubet's testimony on this matter to be credible. Even assuming defendant's testimony regarding the lack of communication to be true, it is not likely that the trial would have resulted in his acquittal if Doubet had discussed the discovery more thoroughly given the strength of the State's case.

¶ 56    Furthermore, the trial court also found credible Doubet's testimony that he did not believe the 911 call would have been helpful to defendant's case. While this was not verifiable because the call no longer existed, Doubet cited his professional experience as a defense attorney that 911 calls involving domestic battery claims often painted the accused in a negative light. Moreover, it was established at trial that during the 911 call, Adams informed dispatch she knew defendant to own a gun that he kept in a black and red bag in his vehicle—a description matching the revolver eventually found outside near defendant's Suburban. Although defendant claims the fact the gun was not found in the vehicle would have supported his theory of the case that the gun

belonged to someone else and he did not know the police were coming, it could have just as easily supported the State's theory the gun belonged to defendant and he attempted to conceal it after his altercation with Adams.

¶ 57 Finally, having already determined, *supra* ¶ 44-47, only one of the trial court's challenged comments was improper but nonetheless did not contribute to defendant's convictions, we necessarily conclude defendant also cannot demonstrate prejudice with respect to his ineffective assistance claim regarding defense counsel's failure to object to the same.

¶ 58 Based on the testimony presented at the hearing and our review of the record, the trial court's determination defendant was not denied the effective assistance of counsel was not manifestly erroneous. Accordingly, we affirm the judgment.

¶ 59 III. CONCLUSION

¶ 60 For the reasons stated, we affirm the trial court's judgment.

¶ 61 Affirmed.