2026 IL App (1st) 230142-U

No. 1-23-0142

Order filed April 23, 2026

FOURTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 14566 |
| | ) | |
| EUGENE JOHNSON AKA ROBERT JOHNSON, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Navarro and Justice Quish concurred in the judgment.

**ORDER**

¶ 1    *Held*: The evidence was sufficient to convict the defendant of attempted first degree murder. The circuit court did not commit plain error in admitting the body-camera video footage or in allowing a witness to testify to the content of a police dispatch.

¶ 2    Following a jury trial, the defendant-appellant, Robert Johnson, also known as Eugene Johnson, was convicted of attempted first degree murder and armed habitual criminal (AHC) and

sentenced to concurrent prison terms of 21 and 20 years, respectively.[1] On appeal, Mr. Johnson argues that: (1) the evidence was insufficient to convict him of attempted murder and (2) the trial court erred in admitting hearsay statements into evidence from police body-camera video footage and the content of a police dispatch. We affirm the judgment of the circuit court of Cook County.

¶ 3                                BACKGROUND

¶ 4        Mr. Johnson was charged with attempted first degree murder and aggravated discharge of a firearm for shooting at Crystal Fleming on or about October 30, 2021. He was also charged with home invasion and AHC committed on the same date.

¶ 5        At the August 2022 trial, Ms. Fleming testified that on October 30, 2021, she was living with her children and Mr. Johnson, her boyfriend at the time. Ms. Fleming's relatives, including her stepfather, Michael Haney, were staying in her home for the funeral of Ms. Fleming's mother. In the early morning, Ms. Fleming and her children were asleep in one bed when Mr. Johnson came home using his key, woke her, and berated her for not picking him up. Mr. Johnson and Ms. Fleming then fought, hitting each other. They were both upset, and Ms. Fleming could not recall who struck the first blow. They fought through the home and "woke the whole house up."

¶ 6        At some point, Mr. Haney "jumped in and grabbed [Mr. Johnson] and started choking him." They fought in the hallway by the kitchen while Ms. Fleming was in the living room. When asked what happened next and when Mr. Haney stopped fighting Mr. Johnson, Ms. Fleming replied she was "not sure" and said that "eventually the whole situation ended when the police came. But when they was fighting, *** I can't remember all this. It happened too long ago and

---

[1] While the defendant was referred to as both Eugene Johnson and Robert Johnson in the charges and pretrial proceedings, he repeatedly stated that his name was Robert Johnson, was referred to by that name at trial, and filed his notice of appeal under that name.

\*\*\* was happening too fast." She did not believe Mr. Johnson came home with a firearm, as he did not "own a gun." Ms. Fleming also did not believe anyone else in the home "had a gun." When asked if any weapon was fired, Ms. Fleming replied, "I believe so, but I didn't see any bullets. There's no bullets nowhere in the house." She heard a "loud sound" but did not see a firearm.

¶ 7    Ms. Fleming believed the neighbors called the police due to the disturbance in the middle of the night. She could not remember what she did when the police arrived, except that she told them "we was fighting." The police arrested Mr. Johnson. Ms. Fleming acknowledged giving the police a firearm when they told her a gunshot was heard and asked if she knew of a firearm. She found it on the floor upstairs "where we was back and forth fighting." She did not know where it came from as she did not see either Mr. Johnson or Mr. Haney holding a firearm. Ms. Fleming owned a firearm, but the one she gave to the police was not hers. She had a swollen eye and bruised back. The police photographed her injuries but did not search the house. The police found a hole in the wall, but Ms. Fleming testified that it was a nail hole. She did not recall police asking her to sign a complaint or file charges while she was still at home, but she "was under the influence" at the time and "don't remember none of this."

¶ 8    Police asked Ms. Fleming to come to the police station that evening, and she did. There, she spoke with "a lot of people," whom she could not remember at trial. She explained that an unspecified man called her and "basically lied to get" her to come to the station. She also went to the police station the next day with Mr. Haney. While she initially denied speaking with an assistant state's attorney (ASA), she acknowledged that "a lady" was present for her interview with a detective. While she spoke to "a lot of different people about a lot of different stuff," she

acknowledged discussing "the events of October 30th" during the interview but could not remember discussing the firearm.

¶ 9   Ms. Fleming answered "I don't know" when asked if "the lady" told her that her statement would be recorded. She recalled that "they wrote something down" and "had me to sign something," but claimed that she signed "a blank piece of paper" and denied it was a photograph. She testified "[t]hey [were] just taking advantage of me," because "it's very obvious" she "was under the influence of alcohol." She denied making a statement that Mr. Johnson pointed a firearm at her and fired and that she ducked, causing the bullet to strike the wall. She also denied that she was shown a photograph of Mr. Johnson to identify by signing the back. At the start of trial, she was still in frequent telephone contact with Mr. Johnson.

¶ 10   On cross-examination, Ms. Fleming testified that on October 30, 2021, she had been drinking alcohol five days earlier. She reiterated her direct-examination account that Mr. Johnson confronted her, they were "tussling" through their home from an upstairs bedroom down to the kitchen, and Mr. Haney grabbed Mr. Johnson, choking him and pulling him away from her. She explained "at some point this altercation in the kitchen ended," but Mr. Johnson and Ms. Fleming resumed fighting and were upstairs fighting when police arrived. She found a firearm in the upstairs hallway, near the bathroom, and gave it to the police. She denied that Mr. Johnson ever pointed a firearm at her face, adding that they were standing so close she would have been shot if he had discharged the firearm. She admitted being upset and angry with Mr. Johnson when she went to the police station.

¶ 11   Detective David Scarriot testified that he interviewed Ms. Fleming on October 30, 2021, and again on the following day. ASA Lakeya Duncan joined Detective Scarriot for the latter

interview, and the interview was electronically recorded. ASA Duncan testified similarly and identified a video as accurately depicting the October 31st interview of Ms. Fleming. The video was admitted into evidence without objection and published at trial. ASA Duncan testified that Ms. Fleming expressed her willingness to be interviewed. ASA Duncan denied having Ms. Fleming sign a blank sheet of paper. Ms. Fleming seemed calm and gave a "very orderly" account of the incident at issue, and she did not make any remarks that she was under the influence of alcohol or felt coerced.

¶ 12     In the video, Ms. Fleming states that Mr. Johnson had a firearm pointed at her, then reached around Mr. Haney and shot once at her when they were a few feet apart. Ms. Fleming identified a photograph of Mr. Johnson as the man who attacked and shot at her on October 30, 2021. She signed and dated the back of the photograph. The video showed ASA Duncan holding a photograph of a man's face, flipping it over, and Ms. Fleming writing on the back of the same photograph.

¶ 13     Police officers Rhonda Ward and Jasmyne Watkins testified that, on the early morning of October 30, 2021, they were dispatched to Ms. Fleming's home, where they were looking for the person who had called 911. Officer Ward described the report as "a little kid and his mother needed help." Officer Watkins testified, over Mr. Johnson's objection, that the report was "a 7 year old calling, saying someone is shooting inside of the house at his mom." An older man exited the home and stood on the steps. Officer Ward asked the man "was the person still there, and he said yes."

¶ 14     Officers Ward and Watkins entered the home with their weapons drawn due to "the nature of the call." They were looking for the child and a woman and "trying to see if the offender was still on the scene." Officer Watkins asked the older man from the steps "is the guy upstairs," and the man responded he was. Officer Watkins called out, stating that the person should come

downstairs. A man, holding a dog, descended the stairs. Officers Ward and Watkins identified that man as Mr. Johnson.

¶ 15    Officers Ward and Watkins also met Ms. Fleming, and Officer Ward asked her if Mr. Johnson was the man who hurt her. The court overruled Mr. Johnson's objection, and Officer Ward testified that Ms. Fleming "confirmed." Officer Ward also asked her if she knew if there was a weapon and she said there was. Officer Ward then asked her to retrieve it. Ms. Fleming went upstairs and returned with a firearm, of which Officer Ward took possession. Ms. Fleming described what had happened, then Officers Ward and Watkins went to the area between the dining room and kitchen to look for a spent shell casing and bullet holes. Officer Watkins did not recall Ms. Fleming showing any signs of being under the influence of alcohol or making any remarks that she was.

¶ 16    Officer Ward was wearing a video camera that day. She identified a still photograph from the video recording as depicting the "place where [Ms. Fleming] said he possibly fired the handgun" including a "shell casing on the floor." Mr. Johnson objected to Officer Ward's characterization but not to admission of the photograph. Officer Ward learned that another officer later recovered the shell casing and noted "a bullet hole in the wall."

¶ 17    Officer Watkins had a body worn camera that day, and identified video footage as being an accurate depiction of her investigation that day. The video was admitted into evidence without objection. However, when the video footage was published, Mr. Johnson made a hearsay objection that was overruled.

¶ 18    Officer Watkins testified that she detained Mr. Johnson and then spoke with Ms. Fleming, who described what had happened, including describing her injuries and identifying the other

person involved. When Officer Watkins was asked if Ms. Fleming mentioned gunshots, Mr. Johnson made a hearsay objection, also arguing that the testimony could not be for identification because Mr. Johnson had already been identified. The State's offer of proof was that Officer Watkins's video showed Ms. Fleming saying that Mr. Johnson fired at her but missed. The court overruled the objection, finding that the statement was admissible as identification of a person the witness perceived earlier, with the proviso that only the portion of Officer Watkins's video showing Ms. Fleming's identification of Mr. Johnson would be admitted.

¶ 19    When asked if Ms. Fleming mentioned gunshots or identified anyone, Officer Watkins replied that Ms. Fleming mentioned both and Officer Watkins' camera recorded Ms. Fleming's answers. A portion of the video was shown, then Watkins testified that she went to the hallway between the dining room and kitchen to look for a shell casing and bullet hole. Watkins's video depicting that search was then shown at trial.

¶ 20    This court has viewed Officer Watkins's body worn camera footage, which shows Officers Ward and Watkins arriving at the home. In the video footage, they asked a man on the front steps "where the person" was, and he replied, "right here." They asked, "he's upstairs, the guy with the gun?" and the man says "yeah." The officers then entered the home with their weapons drawn and pointed up the interior stairs. A man descended the stairs holding a dog, and the man was detained. Later, the officers asked Ms. Fleming if anyone was shot, and she replied that Mr. Johnson shot at her, distinguishing him from the other men present by his hair.

¶ 21    Ron Bialota, an evidence technician, testified to examining and photographing Ms. Fleming's home on October 30, 2021. He recovered a spent firearm shell casing on the dining

room floor and saw an apparent bullet hole high on the dining room wall near a corner. He photographed both locations and also took photographs of Ms. Fleming's injuries.

¶ 22    Marc Pomerance, a forensic scientist, testified that his testing showed that the firearm provided by Ms. Fleming had fired the spent casing recovered in her home.

¶ 23    A detective testified to swabbing Mr. Johnson's hands on October 30, 2021, and Ruquiyah Wilson, a forensic scientist, testified that the swabs tested "essentially" negative for gunshot residue. Wilson explained that gunshot residue could be absent from a sample because it was "removed by activity" or "lead-free ammunition could have been used." On cross-examination, Wilson testified that the samples contained no "tricomponent particles" of gunshot residue.

¶ 24    Detective Scarriot testified that he and another detective interviewed Mr. Johnson at the police station on October 30, 2021. Detective Scarriot identified a video recording as accurately depicting that interview, which was admitted into evidence and published at trial without objection.

¶ 25    In the video, Mr. Johnson denied that he "shot the gun" but admitted that "the gun went off" in the living room as he and Ms. Fleming were "tussling." Mr. Johnson explained that the firearm was upstairs because he gave it to Ms. Fleming as they were both upstairs.

¶ 26    The parties stipulated that Mr. Johnson had two prior qualifying felony convictions for purposes of AHC. The court denied Mr. Johnson's motion for a directed verdict, and Mr. Johnson chose not to testify after the court admonished him of his right to do so.

¶ 27    The jury found Mr. Johnson guilty of attempted murder, aggravated discharge, and AHC and not guilty of home invasion. The jury also found that Mr. Johnson personally discharged a firearm in committing attempted murder.

¶ 28    Mr. Johnson's posttrial motion challenged the sufficiency of the trial evidence but not the admission of any evidence. The trial court denied the motion. Following the sentencing hearing, the court merged the aggravated discharge conviction into the attempted murder conviction and sentenced Mr. Johnson to concurrent prison terms of 21 years for attempted murder and 20 years for AHC. This appeal timely followed.

¶ 29                                    ANALYSIS

¶ 30    We note that we have jurisdiction to consider this matter, as Mr. Johnson filed a timely notice of appeal. See Ill. S. Ct. R. 606 (eff. July 1, 2017).

¶ 31    On appeal, Mr. Johnson first contends that the evidence was insufficient to convict him of attempted murder because, at trial, Ms. Fleming recanted her earlier statements against him so that those prior inconsistent statements were the only direct evidence against him.

¶ 32    In considering a challenge to the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Gray*, 2024 IL 127815, ¶ 20. We must draw all reasonable inferences in favor of the State, and the State is not required to exclude every reasonable alternative explanation consistent with the defendant's innocence. *People v. Grayer*, 2023 IL 128871, ¶ 32. Similarly, the trier of fact is not required to disregard inferences that flow normally from the evidence. *People v. Bush*, 2023 IL 128747, ¶ 33. We set aside a conviction only when "the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Id.*

¶ 33    The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from the evidence. *People v. Conway*, 2023 IL 127670, ¶ 20. We will not

retry the defendant or substitute our judgment for that of the trier of fact regarding the weight of evidence or witness credibility. *Id.* ¶ 16. "The trier of fact may accept or reject all or part of a witness' testimony." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 62.

¶ 34    Intent to commit a criminal offense need not be expressed but may be inferred from the defendant's conduct and the attending circumstances. *Grayer*, 2023 IL 128871, ¶ 28. A conviction may be sustained on circumstantial evidence alone. *Id.* "A defendant is presumed to intend the natural and probable consequences of his or her acts." *People v. Mulosmani*, 2022 IL App (1st) 200635, ¶ 65.

¶ 35    A person commits first degree murder when, in performing acts that cause the death of another person, he or she intends to kill or do great bodily harm to the victim or another, knows that the acts will cause the death of the victim or another, or knows the acts create a strong probability of death or great bodily harm to the victim or another. *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 35. A person commits attempted murder when, with intent to commit murder, he or she takes any substantial step towards committing murder. *Id.*

¶ 36    After reviewing the evidence in the light most favorable to the State, we find that it was sufficient to convict Mr. Johnson of attempted murder beyond a reasonable doubt. Ms. Fleming gave two very different accounts. Her first was before trial, where she stated that Mr. Johnson pointed a firearm at her and fired once. The other was at trial, where she testified that she did not see Mr. Johnson hold or fire a weapon. As stated above, a trier of fact may accept or reject all or a part of a witness's account. *Bush*, 2023 IL 128747, ¶ 36. The jury here could reasonably accept portions of Ms. Fleming's trial testimony while rejecting the portions recanting her pretrial

account. Given the verdict, the jury evidently credited Ms. Fleming's inculpatory pretrial account, memorialized in the video published to the jury, over her trial testimony.

¶ 37    In the video, Ms. Fleming stated that, during their fight, Mr. Johnson had a firearm pointed at her, then reached around Mr. Haney and shot once at her when they were a few feet apart. See *Mulosmani*, 2022 IL App (1st) 200635, ¶ 65 ("a defendant is presumed to intend the natural and probable consequences of his or her acts"). Ms. Fleming identified a photograph of Mr. Johnson, as the man who attacked and shot at her, and she signed and dated the back of the photograph. See *People v. Hill*, 2023 IL App (1st) 150396, ¶ 23 (stating the credible testimony of a single eyewitness is sufficient to convict). This evidence alone was sufficient for the jury to find Mr. Johnson guilty of attempted murder, and we will not substitute our judgment for that of the trier of fact. Stated differently, we do not find the jury's acceptance of Ms. Fleming's pretrial account to be so unreasonable or unsatisfactory to leave us with reasonable doubt of guilt.

¶ 38    This is especially so here, where Ms. Fleming's pretrial account was corroborated and her trial testimony to the contrary was impeached. The physical evidence consisted of a shell casing and hole in the wall at the scene of the altercation, supporting Ms. Fleming's account that Mr. Johnson shot at her. Forensic scientist Pomerance testified that his testing showed that the firearm provided by Ms. Fleming had fired the spent shell casing recovered in her home. In his statement, Mr. Johnson admitted that "the gun went off" although he denied firing it. The trier of fact need not elevate to reasonable doubt the possibility that an unknown "someone in the house fired a gun that evening" or that the gun inadvertently discharged when Ms. Fleming gave an account identifying that "someone" as the man who shot at her. On review, this court must draw all reasonable inferences from the evidence in the State's favor. See *Grayer*, 2023 IL 128871, ¶ 32.

¶ 39     Finally, as to Ms. Fleming's testimony that she was given a blank page to sign, the jury also heard ASA Duncan's testimony that she did no such thing. Moreover, the jury saw video of Ms. Fleming's interview depicting her writing on the back of Mr. Johnson's photograph, not a blank sheet of paper. In sum, we cannot find that the evidence that Mr. Johnson intentionally shot at Ms. Fleming was so unsatisfactory that we have reasonable doubt of his guilt of attempted first degree murder.

¶ 40     Mr. Johnson also contended that the trial court erred in admitting multiple hearsay statements: statements on the body-camera video footage and testimony to the content of the police dispatch.

¶ 41     Mr. Johnson acknowledged that this contention was not preserved and is forfeited. *Bush*, 2023 IL 128747, ¶ 56 (an issue must be raised in a motion or objection, and again in a posttrial motion, to be preserved). He argued that this claim should be considered plain error under either prong of the plain error doctrine, or as a claim that his trial counsel was ineffective for not preserving it. The State responds that the evidence at issue was properly admitted, thus there is no error.

¶ 42     Under the plain error doctrine, a forfeited claim is reviewed if error is clear and obvious and either (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice, or (2) the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. *Id.* ¶ 71. A defendant can succeed under an ineffective assistance of counsel theory if counsel's performance (1) was objectively unreasonable and (2) prejudiced the defendant; that is, there is a reasonable possibility the outcome would be different had counsel not performed unreasonably. *Gray*, 2024 IL 127815, ¶ 29.

¶ 43    The threshold question in a plain-error analysis is whether there was a clear and obvious error at all. *Bush*, 2023 IL 128747, ¶ 71. Similarly, there is no ineffective assistance when counsel fails to raise or pursue a meritless motion or objection. *Id.* ¶ 79.

¶ 44    Hearsay is generally inadmissible and defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); Ill. R. Evid. 802 (eff. Jan. 1, 2011).

¶ 45    However, a prior "identification of a person made after perceiving the person" by a trial witness subject to cross-examination is not hearsay. Ill. R. Evid. 801(d)(1)(B). Likewise, a prior inconsistent statement by a trial witness subject to cross-examination is not hearsay if the statement was made under oath or if it "narrates, describes, or explains an event or condition of which the [witness] had personal knowledge." Ill. R. Evid. 801(d)(1)(A). A prior inconsistent statement not made under oath must be either acknowledged by the witness under oath, "proved to have been written or signed by the" witness, or "proved to have been accurately recorded by *** [an] electronic means of sound recording." *Id.*

¶ 46    The admissibility of evidence is addressed to the trial court's discretion, and its decision is not reversed absent an abuse of discretion. *Bush*, 2023 IL 128747, ¶ 57. An abuse of discretion exists only if the decision was "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *Id.*

¶ 47    Here, Mr. Johnson challenges the admission of Officer Watkins's video footage for including Ms. Fleming's statement that Mr. Johnson shot at her, arguing it was hearsay. However, we find this statement was not hearsay because it is both an identification and prior inconsistent statement under Rule of Evidence 801(d)(1). Whether the parties and court discussed the video's

admissibility as a prior inconsistent statement is irrelevant to our analysis, as we review the trial court's ruling rather than its reasoning and may affirm for any reason apparent on the record. *Phoenix Capital, LLC v. Nsiah*, 2022 IL App (1st) 220067, ¶ 20. The court admitted a statement, and if that statement was not hearsay, its admission was not erroneous as contended.

¶ 48    Ms. Fleming was a trial witness subject to cross-examination, a threshold requirement for both types of non-hearsay in Rule 801(d)(1). She identified Mr. Johnson, a person she indisputably had perceived earlier, by his hair. She described and explained an event of which she had personal knowledge; when asked if anyone was shot, she explained that Mr. Johnson had shot at her. That statement was clearly inconsistent with her trial testimony. Lastly, her statement was proven to have been accurately recorded electronically. We conclude that the portion of Officer Watkins's video footage depicting Ms. Fleming's statement is admissible under Rule of Evidence 801(d)(1) as both an identification and a prior inconsistent statement. As its admission was not erroneous, it was also not plain error, and trial counsel was not ineffective for not preserving a challenge to its admission.

¶ 49    Mr. Johnson also claimed that the trial court erroneously admitted Officer Watkins's video footage of the man on the front porch, as well as Officer Watkins's testimony that she and Officer Ward went to Ms. Fleming's house because a child had reported someone was shooting at his mother. Mr. Johnson argues that both pieces of evidence, by including the content of a statement rather than the mere existence of a statement to which police officers reacted, were hearsay because they went beyond explaining the actions of Officers Ward and Watkins and instead placed the substance of the statements before the jury for the truth of the matter asserted.

¶ 50    We find that there was no error. Assuming *arguendo* we were to find error, the trial evidence was not closely balanced. Ms. Fleming twice stated that Mr. Johnson shot at her—first to police in her home on the night of the incident and again at the police station a day or so later. For each statement, the jury viewed the video recording of her making the statement and could evaluate for themselves her demeanor and the circumstances of the statement. The police station video belied Ms. Fleming's trial testimony that she signed a blank sheet of paper. The shell casing on the dining room floor and apparent bullet hole high in the corner of the dining room physically corroborated Ms. Fleming's pretrial statements.

¶ 51    We also find no second-prong structural plain error. A structural error that falls under the second prong of plain error is not subject to harmless error analysis. *People v. Jackson*, 2022 IL 127256, ¶ 37; *People v. Thompson*, 238 Ill. 2d 598, 608-10 (2010). Hearsay errors, however, implicate the right to confront witnesses, and the Illinois Supreme Court has held that confrontation claims are subject to harmless error. *People v. Patterson*, 217 Ill. 2d 407, 427-28 (2005). This court has previously held that "hearsay testimony from police officers going beyond the scope of explaining police procedure" was not structural error and thus not second prong plain error. *People v. Temple*, 2014 IL App (1st) 111653, ¶ 51. The other evidence at issue here, the video of the man on the front porch, is of the same nature. Instead of being told that officers spoke with someone, which prompted them to their next action, the jury heard the content of the question and answer with the man. We do not find that to be of such structural impact as to be beyond harmless error analysis; so, it is not second prong plain error.

¶ 52    For the same reasons, we find that trial counsel was not ineffective for not preserving challenges to the admission of this evidence because Mr. Johnson was not prejudiced thereby. We

see no reasonable probability that the outcome of the trial would have been different had the jury not heard the statements of the man on the front steps or Officer Watkins's description of the report that brought her to Ms. Fleming's home.

¶ 53                                    CONCLUSION

¶ 54    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 55    Affirmed.