NOTICE
Decision filed 05/12/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230997-U

NO. 5-23-0997

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 18-CF-3694 |
| | ) | |
| WAYNE STAYTON, | ) | Honorable |
| | ) | Ronald R. Slemer, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Presiding Justice Cates and Justice McHaney concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The evidence was sufficient to convict defendant of aggravated driving under the influence.

¶ 2   Following a jury trial, defendant, Wayne Stayton, was convicted of two counts of aggravated driving while under the influence and causing the death (aggravated DUI) of Charlene Johnson. The only issue defendant raises in this direct appeal is whether the State proved him guilty beyond a reasonable doubt. For the reasons that follow, we affirm defendant's convictions.

¶ 3                                 I. BACKGROUND

¶ 4   On December 12, 2018, defendant was charged by information with two counts of aggravated DUI. Count I alleged that on February 23, 2018, defendant had whole blood concentration of five or more nanograms of delta-9-tetrahydrocannabinol (THC) and that he was

1

involved in a motor vehicle accident that caused Johnson's death, and the violation was a proximate cause of Johnson's death, in violation of section 11-501(a)(7) of the Illinois Vehicle Code. 625 ILCS 5/11-501(a)(7) (West 2016). Count II alleged that defendant was under the influence of THC at the time of the accident and otherwise contained the same allegations. *Id.* § 11-501(a)(4). In count III, defendant was charged with reckless homicide. 720 ILCS 5/9-3(a) (West 2016). On January 17, 2019, defendant was indicted on the same charges. Defendant filed an affirmative defense that he had an unforeseen medical condition, namely, bipolar disorder-psychotic episode, which was the proximate cause of the accident.

¶ 5    Defendant's three-day jury trial began on June 13, 2023. The following evidence was presented at trial.

¶ 6    At approximately 4 a.m. on February 23, 2018, the Highland, Illinois, police department received a 911 call regarding an accident on Highway 40 near Kennedy Lane in Madison County, Illinois. It was later determined that defendant's GMC pickup truck crossed the center line of Route 40 and struck a Dodge pickup truck driven by Charlene Johnson. Johnson was killed as result of the collision. Defendant was driving nearly 100 miles per hour at the time of the impact.

¶ 7    Highland police officer Jeremiah Kingery was the first to arrive at the scene. Initially, Kingery could not tell how many vehicles were involved in the accident. Defendant's truck was in three pieces: the engine was in a ditch along the highway, the bed and the frame of the truck, also in the ditch, were several feet from the engine, and the cab of the truck was in the middle of the highway. Officer Kingery heard defendant coming out of the grass and told him to lay down. Defendant kept repeating that he was hurt. Kingery checked the cab of defendant's pickup and smelled cannabis from inside the cab. He did not smell cannabis on defendant.

¶ 8     Officer Kingery then checked Johnson's pickup. Kingery testified that it was barely recognizable as a truck, and he found Johnson sitting on the ground with part of her body still in the truck. Kingery testified, "It was fairly obvious that she was deceased." After the Highland EMS arrived, Kingery was told that Johnson was "beyond help."

¶ 9     Highland paramedics Tyler Barr and Dennis Frailey treated defendant at the scene. Barr testified that when he arrived, defendant was face down in the grass. He touched defendant, and defendant raised up and said, "I'm a member of a drug cartel, take me to the hospital immediately." Defendant then went back to the ground. Seeing that defendant was awake and breathing, Barr went to look for other victims. Frailey testified that when he went to treat defendant, defendant answered basic questions, but "was acting very confused [and] a little bit agitated." Defendant kept saying, "I'm a good boy." Frailey thought this was "out of the ordinary" because accident victims usually complain about their injuries or talk about what happened. Despite an obvious fracture to his left leg, defendant did not complain of pain, even when he stood on his fractured leg. Defendant "basically" placed himself face down on the stretcher. None of the EMTs on the scene smelled the odor of cannabis on defendant, although two of them testified that defendant smelled of body odor. Frailey and his partner transported defendant to a hospital in Highland.

¶ 10    Mariska Neece, a nurse at the hospital, treated defendant. According to Neece, defendant was very confused and gave some inappropriate answers, which could be signs of intoxication and could also signify a mental health problem. Neece was unable to tell whether defendant was under the influence of alcohol or "any narcotic." During the course of treatment, defendant stated that he was driving 100 miles per hour. At the request of the Illinois State Police, Neece collected blood and urine samples from defendant.

¶ 11 Dr. Robert Marshall treated defendant at the hospital. Defendant was confused on arrival and did not answer questions appropriately or did not "seem to understand the question." Dr. Marshall attributed defendant's behavior to either head trauma, some sort of substance, or playing "possum." Defendant's leg was "deformed," but defendant did not exhibit the level of pain associated with an injury of that severity. During treatment, head trauma was eliminated as a source of defendant's confusion. Dr. Marshall ordered a drug screen, which came back positive for the presence of THC and benzodiazepines. Because defendant was "eventually" able to answer questions "more appropriately," Dr. Marshall did not believe that defendant suffered from mental health issues, although Dr. Marshall testified, on cross-examination, that defendant's altered mental state could have been the result of a manic episode involving psychosis. Dr. Marshall testified that defendant "was altered but not manic." He explained that "[m]anic tends to be very aggressive, very talkative. He was none of those things." When asked by Dr. Marshall, defendant denied having a mental health history.

¶ 12 After visiting the scene, Illinois State Police Trooper Emmarie Snyder interviewed defendant at the hospital. She was accompanied by her boss, Master Sergeant Damian Colon. When she first observed defendant, his leg "was twisted backwards." Defendant did not seem bothered by his leg, but "seemed real lethargic with his mannerisms and stuff like that." When Trooper Snyder asked defendant questions, he would "stare right through" her. When she repeated a question, defendant would look at her and repeat the question. When asked whether he remembered anything about the crash, defendant stated that he was driving 100 miles per hour at the time of the accident.

¶ 13 Trooper Snyder "believed" she asked defendant if he had used any drugs that night, and his response was, "I smoke weed." Defendant told Sergeant Colon he smokes weed "occasionally."

Defendant denied taking any other drugs that night. Snyder testified that defendant's eyes were red and bloodshot. Based on defendant's eyes, his admission that he smoked cannabis, his apparent lack of pain in relation to his injury, his mannerisms, lethargy, and his apparent confusion, Snyder was of the opinion that defendant was under the influence of drugs and placed defendant under arrest for driving while under the influence. Trooper Snyder did not believe that defendant suffered any psychiatric issues and had never been told that defendant had bipolar disorder. Sergeant Colon's testimony was consistent with Snyder's testimony. Colon also believed defendant to be under the influence of drugs.

¶ 14　Defendant was transferred to the St. Louis University Hospital's (SLUH) emergency room by paramedics Barr and his partner, John Gooden. During the trip, defendant advised them that, before the accident, he had a mental problem and that he was looking for a hospital but was driving too fast. At SLUH, defendant was initially treated for physical injuries and then for psychiatric issues. Defendant was medicated with lithium and anti-psychotic medication.

¶ 15　Pursuant to a search warrant, police recovered the burnt remains of two hand-rolled cigarettes containing suspected cannabis and a small amount of suspected cannabis from the cab of defendant's truck. The Illinois State Police (ISP) tested the hand-rolled cigarette remains, which indicated the possible presence of cannabinoids. Subsequent testing at the Illinois State Police Forensic Science Laboratory confirmed the presence of THC in the hand-rolled cigarettes collected from defendant's truck.

¶ 16　Alexandra Baluka, a forensic scientist at the ISP crime lab, analyzed defendant's urine sample. The sample tested positive for THC metabolite and a clonazepam metabolite. Clonazepam is a benzodiazepine used to treat anxiety, as an anticonvulsant or as a sedative. Baluka testified

5

that additional testing was requested to determine whether defendant's sample contained Sertraline, and that it was not detected.

¶ 17 Jennifer Bash, a forensic scientist and toxicologist with the University of Illinois at Chicago Analytical Forensic Testing Laboratory, testified that she tested defendant's blood sample and "found a THC concentration of 7 plus or minus 0.7 nanograms per mil and the presence of 11-hydroxy THC, the THC metabolite detected in the blood." Bash stated that THC is one of the active cannabinoids found in marijuana. Bash testified that when a person ingests cannabis, there is a very rapid increase in the THC in the body and that a person will reach peak concentration within 15 minutes. From that point, the body excretes the THC and the amount of THC present in the blood continually decreases until it is gone. Bash explained that THC generally left the bloodstream in two to six hours, and that the levels would not increase unless the person ingested more cannabis. Bash opined that a person operating a vehicle with defendant's THC levels would be incapable of safely driving. On cross-examination, Bash testified that while a person "can have a minimal store of the active compound" of THC in their body, the inactive metabolites are stored for a longer period of time.

¶ 18 Dr. Christopher Long, a forensic toxicologist, testified that THC is the psychoactive compound that is "[t]echnically" classified as a hallucinogen. He also testified that, at therapeutic levels, it is only present in the blood for a short period of time. Long explained that THC metabolizes into "11-hydroxy" which in turn metabolizes into "carboxy THC." When cannabis is consumed, the THC "goes in real quick, it peaks real quick, it stays around for a short period of time. If you stop using it[,] it drops off precipitously." Long testified that some THC is stored in the body's fat "so you get low level residuals, like one or two nano[grams]," noting this amount is below the presumptive limit of five nanograms. Dr. Long opined that a person with a blood level

6

of seven nanograms of THC can be confused, have impaired judgment, and would not perceive time and space. Dr. Long stated that "marijuana impairs *** the ability to see, perceive, comprehend, and then take appropriate action." According to Dr. Long, someone with seven nanograms of THC could not safely drive a vehicle.

¶ 19    Defendant called three witnesses. Defendant's son, C.S., testified that on February 23, 2018, at about 3 a.m., he was playing video games on the first floor of their home when defendant came downstairs from the second floor. C.S. said defendant acted erratically, had a "wide-eyed blank stare," and rambled incoherently for 5 to 10 minutes. C.S. testified that defendant told him that people "were coming to get him." Defendant went back upstairs for 10 to 20 minutes. C.S. then heard defendant come back downstairs and exit the back of the house. C.S. followed defendant out of the house and found him trying to put his eight-year-old sister into the car. C.S. told defendant that his sister had school tomorrow and took her back upstairs to bed. He then called his grandmother. C.S. said that defendant left the house without his shoes and his phone. C.S. also testified that defendant acted strangely during the week prior to the crash. C.S. said defendant "just had this energy about him," was acting paranoid, and that he bought two safes, a device to detect listening devices or bugs, and surveillance cameras.

¶ 20    Dr. Arturo Taca, a psychiatrist, testified for defendant. Dr. Taca testified that he reviewed defendant's medical records from his primary care doctor, documents associated with the case including defendant's post-crash statement, and defendant's medical records. He did not personally interview defendant. Dr. Taca testified that defendant suffered from a "severe mood disorder." Based upon records he reviewed, Dr. Taca believed defendant suffered from bipolar disorder starting when defendant was a teenager. Dr. Taca offered that defendant sought treatment for his mood anxiety and depression, and although bipolar disorder is a form of depression, the

7

wrong medication, like Sertraline, can cause a bipolar person to flip, or cycle, quickly into depression or mania, the latter being "kind of rare." According to the records Dr. Taca reviewed, defendant's primary doctor started defendant on Sertraline about one week before the crash. Also, according to the reports from defendant's post-accident treatment in the psychiatric unit at SLUH, defendant self-reported that he had taken Sertraline. Dr. Taca believed this prescription caused defendant to quickly cycle up and down.

¶ 21    Dr. Taca testified that paranoia can be an element of a manic episode. He explained that a person in a manic state could have so much energy that they lose the ability to sleep, which in turn could lead to a psychotic episode or a break from reality. Dr. Taca agreed that it is common for a paranoid person to become obsessed with security and to buy equipment to test for surveillance equipment or to believe that someone is following or chasing them.

¶ 22    Dr. Taca also testified about the effect that cannabis has on people. He stated that driving 100 miles per hour is not consistent with marijuana use and that "typically people who are smoking marijuana are driving slower, not faster." Dr. Taca was "not so convinced" that defendant was intoxicated at the time of the crash, "given the level that was taken." Based upon how marijuana is metabolized and stored in the body, Dr. Taca thought it "almost nearly impossible to determine [marijuana] intoxication from one level" in a person's blood. Dr. Taca opined that defendant's mental status at the time of the crash was most likely due to the effects of antidepressant medication which led to a manic episode with psychotic features. Dr. Taca found support for his conclusion based upon the fact that defendant's condition improved when he discontinued antidepressant medications and was placed on lithium and bipolar-specific medications. Ultimately, Dr. Taca could not conclude that defendant's behavior on the night of the crash was caused by either THC

8

intoxication or that it was a drug reaction. Dr. Taca agreed defendant's behavior could have been the result of a combination of factors.

¶ 23    Dr. Sarah Riley, the chief toxicologist for St. Louis County, also testified as an expert for defendant. After reviewing the test results from defendant's blood and urine samples, the police reports, a "Record of Suspect Interview" of defendant, and the forensic toxicology letter from Dr. Long, Dr. Riley formed the opinion "that it could not be concluded whether [defendant] was intoxicated or impaired by THC at the time of the incident." She explained that she had several reasons for her opinion, "first and foremost" of which was "that there is no specific THC concentration that is directly associated with any effect." The second basis for her conclusion was "that it is difficult to interpret low THC concentrations in individuals who use THC chronically, two to three times a week." She testified that THC levels build up in a chronic user's body, and the metabolites will then "sort of redistribute back through into the blood and it could be affected." Dr. Riley disagreed with Dr. Long's opinion, because "there is no concentration that is directly associated with intoxication or impairment in any individual." She also disagreed with Dr. Long's opinion because, even if the testing shows the concentration of THC in the blood, "there's no way to know how much of that is from chronic use and how much of that is from recent use." Regarding the effects of THC on driving, Dr. Riley testified that "the only effect on driving that has been proven statistically" is "lane weaving." She also testified that individuals under the influence of THC "tend to drive slower." Dr. Riley was also questioned about whether Sertraline could cause a false positive for the presence of benzodiazepines in a drug test. She agreed that it was possible in a medical setting.

¶ 24    On cross-examination, Dr. Riley testified that if testing specifically for the presence of Sertraline was negative, it would be less likely that Sertraline caused a false positive for the

9

presence of benzodiazepines. Dr. Riley also testified on cross-examination that confusion along with a concentration of 6.3 nanograms per milliliter would corroborate THC intoxication. She agreed that the same could be said of lane weaving, a distorted sense of time and space, affected visual acuity and reaction times, and red eyes. She also testified that a chronic user "can have a concentration of 6.3 nanograms per mil seven days after their last use." She also acknowledged that even though she did not believe that THC concentration is a reliable indicator of THC intoxication, her lab routinely quantified THC concentration for the police and the coroner's office.

¶ 25    Following closing arguments, the jury convicted defendant of both counts of aggravated DUI. Defendant was acquitted of reckless homicide. During the September 15, 2023, sentencing hearing, the trial court merged the aggravated DUI counts and sentenced defendant to 10 years in the Illinois Department of Corrections on count I. On October 20, 2023, the court filed an amended sentencing order, correcting the felony classification for count I.

¶ 26    On October 23, 2023, defendant filed a late notice of appeal. Appellate counsel for defendant filed a motion for leave to file late notice of appeal, which was granted by this court. This appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28    On appeal, defendant contends only that the State did not prove him guilty beyond a reasonable doubt. Specifically, defendant argues that "the defense experts' opinions that testing could not establish whether the THC in defendant's blood and urine was from recent use was not refuted by the prosecution's expert." Defendant also insists that "the overwhelming evidence established that the accident occurred because [defendant] was experiencing psychosis from a manic episode and was not the result of cannabis intoxication." For the reasons that follow, we affirm.

10

¶ 29    The standard employed when faced with a challenge to the sufficiency of the evidence is well-established. When considering such a challenge, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Bush*, 2023 IL 128747, ¶ 33 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)).

¶ 30    The standard of reasonable doubt "does not require the court to ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." ' " (Emphasis in original.) *People v. Campbell*, 146 Ill. 2d 366, 374 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), quoting *Woodby v. Immigration & Naturalization Service*, 385 U.S. 276, 282 (1966)). Rather, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Bush*, 2023 IL 128747, ¶ 33 (quoting *Collins*, 106 Ill. 2d at 261). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Givens*, 237 Ill. 2d 311, 334 (2010) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)). "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *Id.* (citing *People v. Schmalz*, 194 Ill. 2d 75, 80 (2000)).

¶ 31    This standard of review "is applicable in all criminal cases, regardless of whether the evidence is direct or circumstantial." *Campbell*, 146 Ill. 2d at 374 (citing *People v. Pintos*, 133 Ill. 2d 286, 291 (1989)). Circumstantial evidence is sufficient to support "a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *Id.* at 379. This "standard gives 'full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to

11

weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Id.* at 375 (quoting *Jackson*, 443 U.S. at 319). For this reason, a reviewing court "will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* (citing *People v. Young*, 128 Ill. 2d 1, 51 (1989)). We "will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.* (citing *Collins*, 106 Ill. 2d at 261).

¶ 32      We first consider defendant's argument that the State failed to prove beyond a reasonable doubt that defendant's whole blood THC level was over five nanograms within two hours of the accident. We note that in his brief, defendant argues that the evidence failed to prove that defendant "had a concentration of five nanograms or more of *recently* ingested THC in his bloodstream within two hours of the accident." (Emphasis added.) In order to be convicted of DUI under the *per se* section of Illinois's DUI statute, the State has to prove, in part, that "the person has, within 2 hours of driving or being in actual physical control of a vehicle, a tetrahydrocannabinol concentration in the person's whole blood or other bodily substance as defined in paragraph 6 of subsection (a) of Section 11-501.2 of this Code." 625 ILCS 5/11-501(a)(7) (West 2016). Section 11-501.2(a)(6) defines tetrahydrocannabinol concentration as "either 5 nanograms or more of delta-9-tetrahydrocannabinol per milliliter of whole blood or 10 nanograms or more of delta-9-tetrahydrocannabinol per milliliter of other bodily substance." *Id.* § 11-501.2(a)(6).

¶ 33      In support of his position, defendant notes that all four expert witnesses, Bash and Dr. Long for the State and Dr. Taca and Dr. Riley for the defense, testified that THC can remain in a person's blood long after a person ingested a drug. Defendant further points out that Dr. Long opined that a person's whole blood could contain 1 or 2 nanograms of latent THC, and defense expert Dr.

12

Riley testified that a chronic user's whole blood THC concentration could be 6.3 nanograms per millimeter seven days after their last use. For these reasons, defendant argues that, even in the light most favorable to the prosecution, the State failed to prove defendant's whole blood THC concentration was five or more nanograms of recently ingested marijuana. However, the State's evidence demonstrated that defendant's whole blood tested positive for 7.0 nanograms of THC per millimeter, plus or minus .07 nanograms, meaning that defendant's whole blood THC concentration could have been 6.3 nanograms per millimeter.

¶ 34    Based on the record before us, defendant's argument is without merit. First, we note that Dr. Riley did not dispute that defendant's THC concentration was in excess of the legal limit. Her opinion was that defendant's whole blood THC concentration was not a good indicator of *impairment*. Second, the whole blood measurement of five or more nanograms of THC does not require proof that the marijuana was *recently* ingested. The presence of five or more nanograms of THC in a person's blood is an amount that can support a finding of guilt for DUI. *Id.* § 11-501(a)(7). Nothing in the statute requires the State to prove that defendant's whole blood THC concentration was the result of *recent* marijuana use, and defendant cites no case law in support of this argument.

¶ 35    Considering the evidence in the light most favorable to State, defendant's whole blood THC concentration could have been as high as 7.7 nanograms per millimeter. Under these circumstances, we find that the jury could have found defendant's whole blood THC level to be in excess of five nanograms per millimeter.

¶ 36    We turn next to defendant's contention that the State failed to prove beyond a reasonable doubt, under count II, that defendant was under the influence of THC to a degree that rendered him incapable of safely operating a motor vehicle. Defendant argues that the evidence

13

"overwhelmingly" shows that the accident occurred because defendant was driving while suffering from psychosis during a manic episode, and not because he was under the influence of cannabis. In support of his argument, defendant relies upon evidence of defendant's "unprecedented" behavior during the week prior to the collision as proof that defendant was experiencing a manic episode. Defendant states this diagnosis is supported by defendant's conduct before and after the crash. For example, defendant points to testimony that people who drive while impaired by marijuana "typically" drive slower; that defendant's confusion, agitation, and bizarre behavior after the accident are all indicative of a manic episode; and that defendant smelling of body odor is consistent with a person abandoning self-care during a manic episode. Defendant also notes that no one smelled cannabis on defendant, and that the evidence demonstrated that defendant responded to treatment with lithium, a drug used to treat bipolar mania.

¶ 37    The State responds that the defendant relies heavily on the defense experts, neither of whom observed defendant after the crash, or personally interviewed defendant, but instead relied upon police and toxicology reports, medical records, and statements that defendant had previously provided to other people. The State contends that there was sufficient evidence to support the jury's conclusion that defendant was under the influence of marijuana. Finally, the State argues that the defendant's argument ignores the fact that defendant could have suffered from a manic episode *and* been under the influence to the extent that he was rendered incapable of safely operating a motor vehicle, that the two are not mutually exclusive. For the following reasons, we agree with the State.

¶ 38    Even assuming that defendant suffered a manic episode at the time of the collision, and notwithstanding the fact that first responders did not smell marijuana on defendant, we find that the State presented sufficient evidence from which a jury could reasonably conclude that defendant

14

was under the influence of THC to the extent that he was rendered incapable of safely operating a motor vehicle.

¶ 39    Dr. Marshall, defendant's treating physician at the emergency room, testified that he attributed defendant's behavior to either head trauma, substance use, or defendant playing "possum." After a CT scan of defendant's head, Dr. Marshall ruled out head trauma as the source of defendant's confusion. Although Dr. Marshall acknowledged that defendant's altered mental state could have been the result of a manic episode involving psychosis, he also testified that he did not believe that defendant was suffering from mental health issues due to defendant's ability to eventually answer questions appropriately. Dr. Marshall also testified that defendant's mental state "was altered but not manic," explaining that someone who is manic "tends to be very aggressive, very talkative. [Defendant] was none of those things."

¶ 40    Additionally, Dr. Long testified that a person with a whole blood THC concentration of seven nanograms per millimeter could be confused, have impaired judgment, would not be able to perceive time and space, and would have his "ability to see, perceive, comprehend, and then take appropriate action" impaired. According to Dr. Long, a person with a THC concentration of seven nanograms could not safely operate a motor vehicle.

¶ 41    Trooper Snyder testified that defendant's eyes were red and bloodshot, that his answers to questions were wrong or inappropriate. She believed she asked defendant if he had "done" any drugs that night, and defendant replied, "I smoke weed." She was present when the nurse asked defendant the same question and he gave the same answer. Snyder believed defendant was under the influence of drugs, an opinion that was shared by her supervisor, Sergeant Colon, who was present in the emergency room with Snyder and defendant. A subsequent search of the cab of defendant's truck found the burnt remains of two hand-rolled marijuana cigarettes.

15

¶ 42    Even though defense expert Dr. Riley disagreed with the State's experts' conclusions that a person with a whole blood THC concentration of seven nanograms per millimeter was an effective way of determining whether the person was impaired, she also acknowledged that confusion, lane weaving, a distorted sense of time and space, affected visual acuity and reaction times, and red eyes, can be taken into consideration in determining whether person is impaired by THC. When asked whether "someone weaving, someone confused, someone with red eyes, someone with inappropriate responses, and someone with over 5.0 nanograms of THC in their system, you are saying that person is sober and clean to drive," Dr. Riley replied, "No, I'm not saying that."

¶ 43    Although the State's experts and the defense experts disagreed with one another as to whether a whole blood THC concentration in excess of 5.0 nanograms was, by itself, indicative of marijuana intoxication, this court will not substitute its judgment for that of the factfinder on questions involving the weight of the evidence or the credibility of the witnesses. For these reasons, we find the evidence presented, when considered in the light most favorable to the State, is not so unreasonable, so improbable, or so unsatisfactory that it justifies a reasonable doubt as to defendant's guilt. Stated another way, a rational factfinder could have found beyond a reasonable doubt that defendant was under the influence of THC to a degree that rendered him incapable of safely driving.

¶ 44                                    III. CONCLUSION

¶ 45    For the foregoing reasons, we affirm defendant's conviction.


¶ 46    Affirmed.